Charles Joseph Holland was charged by indictment with the second degree burglary of Howard Dawson's Grocery, located on Highway 43, South, in Colbert County, Alabama. The jury found the appellant "guilty as charged," and the trial court, after deferring sentence for a presentence investigation and report, and after hearing same, set sentence at ten years imprisonment in the penitentiary.
Prior to trial, appellant's counsel filed a petition for a "psychiatric examination," pursuant to the provisions of Section 15-16-21, Code of Alabama 1975, and prior to trial, after the appellant had been examined at the Muscle Shoals Mental Health Center in Florence, Alabama, filed motions to "stay trial for further psychiatric examination," for a "competency hearing," and finally to "suppress the evidence" as the appellant did not fully comprehend the execution of his confession.
Succinctly stated, this appeal raises two issues which will be dealt with in this opinion as follows: (1) whether or not the trial court abused its discretion in failing to send the appellant to Bryce Hospital in Tuscaloosa, or other facility, for additional psychiatric examination prior to trial, and (2) whether or not the appellant's confession was properly admitted in evidence at trial.
 I
The State's evidence at trial established essentially that Howard Dawson owned Dawson's Grocery, a rural store located about six miles south of Tuscumbia on Alabama Highway 43, leading toward Russellville. *Page 797 
Howard Dawson went to his place of business on the early morning of January 24, 1979, about 7:00 o'clock, and discovered that the front door "had been pried by somebody with bars," and that a padlock was broken off and two lights were on. Dawson related that a table had been pulled against the front door, but the back door was left wide open. Dawson also related that a trailer, located close to the store, had also been broken into that same night, and "two cases of beer had been removed." Dawson identified several photographs of items which were located the following day in a Chevrolet automobile after it was stopped by officers following a chase in Muscle Shoals, then towed to Smitty's Wrecking Company at Sheffield. These items were a missing garbage can, a lot of cooking oil, frozen meats, boxes of tea, and a number of other items of foodstuff. Dawson then identified several photographs made on the morning of January 24, 1979, at the store and also of the vehicle, showing the items inside the automobile and in the trunk thereof.
Dawson further related that he had known the appellant as his family had formerly lived near his store, but several years before had moved into town in Muscle Shoals.
Mrs. Lois Marshall testified that when she got up to go to work on the morning of January 24, 1979, her Chevrolet automobile was missing. This was around 6:00 or 6:15. She stated that she telephoned her employer and the Sheriff's Office, and in a short time the Muscle Shoals police telephoned her and asked that she come in and identify her car which had been involved in a high speed chase and had been wrecked. She stated that she got a ride to town and identified her car that day at Smitty's Wrecking Center. She stated she lived "about a quarter of a mile from Dawson's Grocery on Highway 43."
Tom Riner, a Muscle Shoals police officer, stated that he was on duty on January 24, 1979, and was working the 11:00 to 7:00 shift that morning. He stated that at 5:00 a.m. he received a call from Assistant Chief Jackson to pursue a white and blue 1976 Chevrolet which was then being pursued by Chief Jackson and his fellow officer. He gave the location of the car as being in the vicinity of Lewis Electric, "having just turned off Second Street." Riner indicated that he proceeded to Florence Street, then turned on Gusmus, and there observed the car as it turned "through a yard," and was going off behind the Painters Local (R. 77). He stated, "There is a dropoff there and they went off and wrecked the car." Riner and his partner saw two males get out of the vehicle. "One ran across Gusmus and the other just disappeared." Riner pursued the man across Gusmus and to the back of the Ups Building. There he found a male who had crawled under a van. Riner held a flashlight on the individual and directed that he crawl out. As this white male stood under a street light, he recognized him as being the appellant, Charles Holland. He stated that he had known the appellant for some time, and as he called to his partner, the appellant suddenly took off running. Riner pursued him "across Florence Avenue and behind the house — his parents' residence." He stated he was "approximately twelve feet behind him when he went in the back door" (R. p. 79). Riner stated that he waited for his partner and a detective, and within ten to fifteen minutes they arrived. They went into appellant's parents' home and there placed the appellant under arrest. Riner stated that the appellant was standing inside the living room.
On cross-examination Riner described the appellant as wearing a "dark colored jacket, maybe an Army field jacket," that morning. He stated that he did not fire his pistol because he was in a residential section of town and had positively recognized the appellant and that he was in close pursuit on foot. He stated that the appellant had brown curly hair, was five feet eleven to six feet tall, and weighed about 190 pounds.
Muscle Shoals Police Captain Ray Ridgeway testified that he went to the home of Charles Holland's father on Florence Avenue in Muscle Shoals about 6:00 a.m. on January 24, 1979. He stated that he saw *Page 798 
the appellant being placed under arrest by uniformed officers at his parents' home and that these officers then took the appellant to Police Headquarters. He stated that soon after appellant's arrest he interviewed the appellant in Chief Bowlings' office. He stated that the appellant told him he would talk with him, but he did not wish to talk with Lieutenant Hall. Ridgeway stated that the appellant was given a full Miranda warning at the time of his arrest at his parents' home, and subsequently was given a written Miranda warning at Police Headquarters. This was read to the appellant, and the appellant indicated that he understood it and signed it that morning. Detective Ridgeway also stated that the appellant'sMiranda waiver and statement, which were given to him that morning, were without any threat, intimidation, coercion, or inducement of any kind whatever and the appellant's statement was reduced to writing, which consisted of two pages. This was read back to the appellant. The appellant stated he had difficulty reading and writing so Detective Ridgeway then had the appellant's companion, Mr. Campbell, brought in. In the presence of Mr. Campbell, the appellant gave his statement, it was read to the appellant in Mr. Campbell's presence, and the appellant signed it. Appellant's statement, State's Exhibit One, was admitted into evidence and read. It is as follows (R. p. 99):
 "January 24, 1979, Page No. 2. I, Charles J. Holland, stole a car up the road from Dawson's Grocery Store on Hyw 43. I then went to Dawson's Store and broke in the front door of the store and took items from the store. I left by using the back door. I then went to the trailer that he bootlegs out of and took tape off the window, reached in and unlocked the door, went in and took some beer, approximately two cases and two cans. The key was in the car that I stole. There wasn't anyone with me when I broke in the store. I called my house and had Elbert A. Campbell to meet me at the service station on the corner of Glendale and Second Street. I hitchhiked with a truck driver to the place where I took the car. This is a true statement I have given. Det. Ray Ridgeway.
"Signed Charles J. Holland. Witness: Ray Ridgeway."
Detective Ridgeway stated that the vehicle in which the appellant and his companion had been riding was towed to Smitty's Garage. He stated that there an inventory of the merchandise inside was made, as well as photographs of the missing merchandise.
On cross-examination Detective Ridgeway stated that the appellant "cut his wrist" while in jail, awaiting trial, and was given stitches at the hospital. Detective Ridgeway further testified that the appellant was calm, did not appear sweaty, or to have been under the influence of any type of drug or drink. He stated that appellant calmly gave his statement in the presence of his friend and companion, Mr. Campbell, on January 24, 1979. Detective Ridgeway also stated that he had known the appellant "since he was in middle school at Muscle Shoals School."
An inventory of the items removed from the Chevrolet automobile, belonging to Mrs. Marshall, was read into evidence (R. pp. 105-106), as were the photographs taken of these items, which were identified and admitted.
At the close of the State's evidence, the appellant rested without testifying himself or presenting any evidence in his behalf to the jury.
There was no exception to the oral charge of the trial court.
 II
The appellant's motions filed in the trial court, asking for a stay of trial, for psychiatric examination at Bryce Hospital, and for a competency hearing, were heard ore tenus by the trial court prior to trial.
Prior to this hearing, the trial judge had granted appellant's motion for a psychiatric examination and directed that the appellant be sent to the Mental Health Center at Florence, Alabama, for an examination and evaluation of his mental condition, and that *Page 799 
reports be made directly to the judge concerning his condition. The Sheriff was directed to make the necessary arrangements. This was carried out, and the recommendation was made by Dr. Joseph W. Glaister of the Mental Health Center for the appellant to be examined at Bryce Hospital.
Dr. Joseph W. Glaister and other witnesses were called on March 6, 1979, for the hearing in open court on appellant's motions. The appellant, himself, took the stand and explained that he had been troubled with Dyslexia as a child, which resulted in difficulty in reading at school. He completed the ninth grade and "made pretty good grades" (R. p. 15). He stated that he "would memorize and repeat back" oral tests to make his grades as he did not make good grades in English or reading. Appellant stated that his doctor had told him that Dyslexia was "the medical term for someone who does not see written paper correctly in their mind."
On the morning of his arrest, January 24, 1979, the appellant stated that Detective Ridgeway did read the statement back to him, but that he could not make out some words and was not able to read all of it. He stated that he remembered signing some papers, maybe a Miranda warning, but this was all vague in his mind because he had taken "eight valium tablets" early that morning, the date of his arrest.
On cross-examination the appellant admitted that he knew Detective Ridgeway, that he had read something to him, but he did not know whether it was a Miranda warning, and he was asked if he had any objections to the statement. He stated that he "could not think of any, so he signed it." He stated that he vaguely remembered answering some questions, but he "wasn't sure" if Mr. Campbell was present when Mr. Ridgeway read the statement to him, but he acknowledged later that Mr. Campbell was present, that there was another man in the office, but he was not sure about any other man being present. He stated that he had a prescription for valium and that this "is to enable him to bring himself under control." He stated that he took eight valiums that morning "to get high" and that was before he was arrested. He stated that he did not remember the theft of a 1976 Chevrolet automobile at the Marshalls, or of going by Dawson's Grocery. He stated that he had been at his parents' home about thirty-five minutes on the morning in question before the police officers came.
In response to questioning, the appellant stated that he did not recall making the various statements set forth in his written statement, which was witnessed by Captain Ridgeway. In response to questioning, the appellant admitted two prior convictions: (1) Possession of drugs for personal use of same, on February 3, 1977; and (2) Buying and concealing stolen property. Appellant stated he had been sent to Bryce Hospital for examination "sometime during 1977 by the Circuit Court."
Pride Tompkins, an attorney in Tuscumbia, Alabama, stated that he had been asked by the family of the appellant to represent him concerning several offenses at an earlier time. He stated he had the appellant examined at the Mental Health Center in Florence, and that he was also sent to Bryce Hospital in Tuscaloosa by court order for examination in 1977. Tompkins stated that the appellant needed help, something was disturbing him, and he had had a problem for some time. Tompkins related that some of the prior charges were just misdemeanors. He stated that due to appellant's reading difficulty he did not always understand things. Mr. Tompkins was then asked to examine the report from Bryce Hospital for 1977, which noted that the appellant was found "sane" and "competent to stand trial at that time." Tompkins stated that he felt the appellant still had a problem.
Dr. Joseph W. Glaister testified he first examined the appellant, Charles Holland, in 1977, in response to a court order, and found the appellant "competent to stand trial," and that he "could assist counsel for his defense." Under further questioning, Dr. Glaister stated that in his opinion the appellant "knew the difference between right and wrong" and that his intelligence *Page 800 
"was not of such a low degree that he could be judged mentally retarded and not know right from wrong . . . It was my feeling following the examination that he was not psychotic." He stated that it was possible for a person to change from day to day and that a person could have been competent in 1977 and not competent in 1979. He stated that in 1977 he diagnosed the appellant as a latent schizophrenic and recommended that he be sent to Bryce Hospital for examination. He stated that this was based on a relatively short examination of the appellant, lasting about two hours on one day. He stated that in 1979 he only saw the appellant for a short time. He stated that the appellant had been adjudged sane and competent to stand trial by Bryce Hospital authorities in 1977, but admitted that he, himself, had some prejudice concerning the appellant's condition. He stated that Dr. Miller at Bryce Hospital had stated that the appellant "had some thought disorder."
Ronnie May testified that he had known the appellant, but had not dealt with him in about a year and a half, but felt that he needed help.
Muscle Shoals Police Captain Ray Ridgeway stated that on the morning of January 24, 1979, he saw the appellant at the home of his parents shortly after 6:00 a.m. He was arrested and taken to Police Headquarters by uniformed officers. Appellant was given a Miranda warning before his arrest and before any interrogation at Police Headquarters. He stated that the appellant objected to the presence of Lieutenant Hall, and he then had appellant's companion, Mr. Campbell, brought in so that he could be present when the appellant gave his statement. He stated that the appellant was not threatened, coerced, intimidated, or induced into giving any statement, but signed aMiranda warning after having same explained to him and read to him. This was in the presence of his friend, Mr. Campbell.
Captain Ridgeway stated that he had known the appellant from his years at middle school on up. He stated that the appellant's speech was not slurred, nor were his eyes glassy, nor did he give any indication that he had been taking any alcohol or drugs of any kind on the date of his arrest or prior to interrogation. He did not notice anything about the appellant's behavior or conduct which was unusual. He stated that appellant gave a voluntary statement, which was written down, read back to appellant, and signed by him in the presence of his friend, Mr. Campbell. The appellant's statement was then offered into evidence as State's Exhibit One.
On cross-examination, Captain Ridgeway stated that he was not aware of the appellant taking any kind of medication, that at the time of his arrest he recalled that the appellant handed his mother his knife, and perhaps his billfold, but did not recall any medication or pills being handed to her. He stated that he did not recall the appellant's eyes being red and that his speech was normal. He stated that he had observed many people following arrest and that he did not interrogate anyone whom he felt was under the influence of drugs or liquor. Captain Ridgeway stated that sometime after the appellant's arrest he was aware that the appellant slashed his wrist, using some glass from a light in the ceiling. He stated that this necessitated taking several stitches in his wrist at the hospital.
The appellant's mother, Dorothy May Holland, testified that the appellant handed her a pocketknife, his billfold, and "a bottle of pills" at the time of his arrest. She stated that he had a prescription for valium, and most of the time he carried them. She stated that after his arrest he cut his wrist at the Muscle Shoals Jail, and stitches had to be taken. She stated that after another charge in 1978 he shot himself with a .22 rifle on June 1, 1978, near the ribs.
At the conclusion of the hearing and the testimony of the above witnesses, the trial court entered its order denying each of the appellant's motions, as above enumerated.
Mr. Justice Almon, then Judge Almon of the Court of Criminal Appeals, stated in Edgerson v. State, 53 Ala. App. 581,302 So.2d 556 (1974), after reviewing a number of authorities on the subject, as follows: *Page 801 
 "We adopt the majority view and hold that a criminal defendant must have an understanding of the proceedings against him and an ability to communicate with his attorney in preparing his defense before he may be proceeded against criminally."
The Supreme Court of the United States determined in Drope v.Missouri, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975), that the test for mental competency to stand trial, as distinguished from the standard to determine mental culpability for the criminal act, is "whether the appellant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational, as well as a factual understanding, of the proceedings against him." See also Davis v. Alabama,545 F.2d 460, cert. denied, 431 U.S. 957, 97 S.Ct. 2682, 53 L.Ed.2d 275
(Fifth Cir., 1977); and Franklin v. United States, 589 F.2d 192
(Fifth Cir., 1979).
When confronted with the question of a defendant's competency to stand trial, Judge Bowen, speaking for this Court, in Atwellv. State, Ala.Cr.App., 354 So.2d 30, cert. denied, 354 So.2d 39
(Ala. 1977), stated:
 "When the issue of competency to stand trial is properly raised or when facts are present before the trial judge which create a reasonable and bona fide doubt as to the mental competency of the accused to stand trial, there is no question but that the trial judge must take steps to assure a reasonable legal determination of such questions. Where reasonable cause is shown to believe that the accused may be incompetent to stand trial, the judge, under Alabama law, has two alternatives: (1) He may empanel a jury as provided by Title 15, § 426, Code of Alabama 1940, Recompiled 1958, or (2) he may, within his discretion, refuse to grant relief under § 426 and establish some alternate method of determining the competence of the defendant to stand trial. Seibold, supra [Seibold v. Daniels, D.C.Ala., 337 F. Supp. 210]; Brinks v. Alabama, 465 F.2d 446 (5th Cir. 1972)."
Here, in response to the foregoing authorities, Judge Johnson directed that the appellant be examined a second time by the Department of Mental Health at Florence. While it is true that this examination in 1979 suggested that the appellant be sent to Bryce Hospital for further psychiatric examination, nevertheless, Dr. Glaister stated that this was a "short examination," that he was "positively prejudiced," that "it was difficult to make an evaluation in a short time, that he was familiar with the prior examinations by himself and by others at Bryce Hospital, and, while the appellant had been determined to be a latent schizophrenic," nevertheless, "he was sane and competent to stand trial." He further indicated that the appellant could understand the proceedings against him and cooperate with his attorney.
Detective Ridgeway, likewise, indicated that when he examined the appellant on the morning of his arrest after he was taken to Police Headquarters, his speech was normal, he did not appear to be under the influence of any type of drugs or narcotics, and that, while the appellant had a reading difficulty, he fully understood the Miranda warning and signed a written waiver, and asked that Lieutenant Hall not be present during questioning. Ridgeway indicated that everyone was sent out of the room, and appellant's friend, Mr. Campbell, was brought in, and appellant was questioned in Mr. Campbell's presence, and gave the information, which was reduced to writing, then read back to the appellant before he signed it. Ridgeway indicated that he saw no indication of insanity or mental difficulty on the occasion of his questioning that morning following arrest.
Moreover, the trial court here examined the appellant, and, while the appellant's answers were that he vaguely remembered being questioned, he acknowledged the presence of his friend, Mr. Campbell, and that he signed a Miranda warning and gave answers, and signed a statement, while "not remembering much about the contents thereof." *Page 802 
During this examination in the presence of the trial judge, the appellant appeared to be rational and to comprehend the nature of the proceedings and questions put to him (R. p. 10-27).
Based upon the foregoing inquiry by the trial court, which established the appellant's competency, as well as his competency to stand trial and assist counsel with his defense, we cannot ascribe error to the trial court's denial of the appellant's motions. Gales v. State, Ala.Cr.App.,338 So.2d 436, cert. denied 338 So.2d 438 (Ala. 1976); Hocutt v. State, Ala.Cr.App., 344 So.2d 194 (1977); Dixon v. State, Ala.Cr.App.,357 So.2d 690 (1978), and authorities herein cited.
 III
Appellant asserts that the trial court should have suppressed his statement given on the morning of his arrest to Captain Ridgeway because he lacked sufficient competency and was "either intoxicated or under the influence of valium" and could not knowingly waive his rights.
We have carefully examined this transcript and have determined therefrom that the appellant was fully apprised of his constitutional rights by Captain Ridgeway prior to his interrogation and by the arresting officers at the time of his arrest. Captain Ridgeway's testimony impresses us as to the conscientious nature of a competent officer endeavoring to safeguard an accused's rights before an interrogation.
It is clear that at appellant's request Lieutenant Hall left the Captain's office, and his friend, Mr. Campbell, was brought in to be with the appellant when he talked with the officer. The appellant then gave his statement, which was admitted into evidence, both at the competency hearing, prior to trial, and on the trial in chief.
We have examined all of the attendant circumstances and conclude that such statements were purely voluntary, and that the appellant had been fully and thoroughly advised of his rights, and that such were intelligently and understandingly given. Crawford v. State, Ala.Cr.App., 377 So.2d 145 (1979), and authorities therein cited; Thomas v. State, Ala.Cr.App.,373 So.2d 1149 (1979).
We have carefully examined this entire record and find same to be free of error. The judgment of the trial court is due to be and the same is hereby
AFFIRMED.
All the Judges concur.