875 So.2d 336 (2003)
Teresa Ann ARCHIE
v.
STATE of Alabama.
CR-01-0922.
Court of Criminal Appeals of Alabama.
February 28, 2003.
Rehearing Denied April 18, 2003.
Certiorari Denied September 19, 2003.
*337 Frank J. Russo, Birmingham; and Gerald Gregory White, Birmingham, for appellant.
William H. Pryor, Jr., atty. gen., and Marc A. Starrett, asst. atty. gen., for appellee.
Alabama Supreme Court 1021241.
PER CURIAM.
The appellant, Teresa Ann Archie, was convicted of murder, a violation of § 13A-6-2(a)(1), Ala.Code 1975. She was sentenced to 20 years' imprisonment.
A review of the record reveals the following. On December 14, 1996, Archie killed her 16-year-old daughter, Shavon,[1] by shooting her twice in the back with a handgun. Archie then put the gun down, walked out of her house, and began to walk down the street. A neighbor, Nancy Adkins, testified that she saw Archie walking down the street and stopped to offer her a ride. According to Adkins, Archie said something to the effect that "she had just been saved by the Lord" (R. 68), and then she stuck her head in Adkins's car window and said "I just shot my daughter." (R. 69.) Archie then got in Adkins's car, and she and Adkins drove to Adkins's house, where Adkins telephoned emergency 911.
The victim was found lying face down outside Archie's residence, and she was pronounced dead at the scene. Police *338 found the murder weapon inside Archie's residence. In a statement to the police, Archie said that at various times she had delusions; that she had been depressed but had not taken the medication prescribed by her "mental illness doctor" since March; that she had recently been "saved from sin"; that she believed that her daughter was worshipping Satan; that she believed she was following God's will so she got her gun and chased her daughter into a bedroom; that her daughter told her that she loved her and begged for her not to shoot her; and that Archie told her daughter that she had to do God's will and then, as her daughter ran out of the room and out of the house, she shot her twice in the back. Archie also indicated in her statement that she knew what she was doing when she shot her daughter, and that she had asked for forgiveness both before and after shooting her daughter.

I.
First, Archie contends that the trial court erred in not holding a hearing to determine her competency to stand trial. Specifically, she contends that the trial court had reasonable doubt as to her competency because, she says, she "had been committed for more than two years, had previous mental illness and treatment, motions for mental evaluation had been filed, and [she] continued to seek medical treatment and therapy for her mental disease or defect during the course of the criminal proceeding." (Archie's brief at p. 1.)
A review of the record reveals that Archie never raised the issue of her competency to stand trial nor did she ever request a hearing on her competency. However, it is well-settled that "`a trial court has an independent duty to inquire into an accused's state of mind when there are reasonable grounds to doubt the accused's competency to stand trial.'" Jackson v. State, 791 So.2d 979, 994 (Ala.Crim. App.2000), quoting Ex parte LaFlore, 445 So.2d 932, 934 (Ala.1983).
In January 1997, one month after the murder, the trial court, at the State's request, ordered Archie to undergo a mental evaluation at Bryce Hospital in Tuscaloosa. At trial, Dr. Joe Dixon testified on Archie's behalf. He said that he had evaluated Archie in February 1997 and determined that she was not stable enough to return to court, but that he reevaluated her in March 1997, and at that time, determined that she was competent to stand trial.[2] (R. 183.) Although Archie's trial did not begin until August 13, 2001, over four years after she had been determined competent to stand trial, nothing in the record suggests that her condition had changed in any way in those four years.
In Brown v. State, 557 So.2d 562 (Ala. Crim.App.1989), this Court stated:
"`A second determination of the defendant's competency to stand trial may be required under the same circumstances as an original determination would be required, that is, where there exist facts which raise a reasonable and bona fide doubt of the defendant's competency.' Miles v. State, 408 So.2d 158, 162 (Ala.Cr.App.1981), cert. denied, Ex parte Miles, 408 So.2d 163 (Ala.1982). `The defendant bears the burden of persuading the court that a reasonable and bona fide doubt exists as to the defendant's mental competency.' Cliff v. *339 State, 518 So.2d 786, 790 (Ala.Cr.App. 1987).
"This court has been reluctant to find that trial courts have abused their discretion in failing to order further investigation into a defendant's competency to stand trial where there has been some previous determination or finding of competency. Cliff, 518 So.2d at 790-91; Blevins v. State, 516 So.2d 914, 915 (Ala. Cr.App.1987); Wisdom v. State, 515 So.2d 730, 733-34 (Ala.Cr.App.1987); Miles, 408 So.2d at 161-62; Wherry v. State, 402 So.2d 1130, 1134 (Ala.Cr.App. 1981); Nelson v. State, 405 So.2d 392, 394 (Ala.Cr.App.1980), reversed on other grounds, 405 So.2d 401 (Ala.1981); Holland v. State, 376 So.2d 796, 801-02 (Ala.Cr.App.), cert. denied, Ex parte Holland, 376 So.2d 802 (Ala.1979); Atwell v. State, 354 So.2d 30, 35-36 (Ala. Cr.App.1977), cert. denied, Ex parte Atwell, 354 So.2d 39 (Ala.1978).
"We recognize that `a trial court has an independent duty to inquire into an accused's state of mind when there are reasonable grounds to doubt the accused's competency to stand trial.' Ex parte LaFlore, 445 So.2d 932, 934 (Ala. 1983). However, under the circumstances of this case, we find that the trial court did not err in denying the defendant's motion of February 16, 1989, for a competency hearing."
557 So.2d at 564-65.
After reviewing the record in this case, including the testimony presented at trial regarding Archie's mental condition, we find nothing that raised a reasonable and bona fide doubt as to Archie's competency to stand trial. Nothing in the record indicates, and Archie made no showing, that her mental condition changed in any way between the time she was determined to be competent to stand trial and the time of the trial. Therefore, we find no error on the part of the trial court in not sua sponte conducting a competency hearing.

II.
Next, Archie contends that she was denied a speedy trial because, she says, she was held at Bryce Hospital for over two years after having been found to be competent to stand trial. As the State correctly points out in its brief to this Court, Archie did not raise this issue in the trial court, and, thus, she did not preserve it for our review. "Even constitutional claims may be waived on appeal if not specifically presented to the trial court." Brown v. State, 705 So.2d 871, 875 (Ala. Crim.App.1997). See, e.g., Page v. State, 622 So.2d 441, 446 (Ala.Crim.App.1993)(defendant's claim that he was denied his right to a speedy trial was procedurally barred where he failed to raise that argument at trial level); Harris v. State, 705 So.2d 542, 549 (Ala.Crim.App. 1997)(speedy-trial claim was not preserved for appeal where the defendant did not assert this right and make the trial judge aware of any prejudice he had allegedly suffered).

III.
Finally, Archie contends that the trial court erroneously denied her motion for a judgment of acquittal because, she says, the evidence was undisputed that at the time of the crime she was suffering from a mental disease or defect, as defined in § 13A-3-1, Ala.Code 1975. She also argues that the verdict was against the weight of the evidence. As she preserved both arguments through timely and proper trial motions, we will address each in turn.
Section 13A-3-1 states, in relevant part:
"(a) It is an affirmative defense to a prosecution for any crime that, at the time of the commission of the acts constituting the offense, the defendant, as a *340 result of severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts. ...
"....
"(c) The defendant has the burden of proving the defense of insanity by clear and convincing evidence."
(Emphasis added.)
In Ware v. State, 584 So.2d 939 (Ala. Crim.App.1991), this Court noted:
"In 1988, the Alabama legislature replaced our insanity defense statute by enacting the `Reasonable Insanity Test Act of 1988,' 1988 Ala. Acts 1051, No. 88-654, now codified at Ala.Code § 13A-3-1 (Supp.1990). Subsection (a) of that statute provides that:
"`It is an affirmative defense to a prosecution for any crime that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.'
"Section 13A-3-1(a) is virtually identical to the federal insanity defense statute, 18 U.S.C. § 17(a) (1988), which `was passed in the wake of John Hinckley's acquittal of charges arising from his actions in shooting President Ronald Reagan and Press Secretary James Brady.' United States v. Cameron, 907 F.2d 1051, 1061 (11th Cir.1990).
"The new Alabama and federal insanity statutes represent a significant change from the insanity defenses previously available in criminal trials. Formerly, a defendant was not responsible for his criminal acts if `at the time of such conduct as a result of mental disease or defect he lack[ed] substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.' Ala.Code § 13A-3-1(a) (1982 Replacement Vol.); United States v. Freeman, 357 F.2d 606, 622 (2d Cir.1966). It is clear that the new § 13A-3-1(a) is `substantially more restrictive' than its predecessor section. United States v. Brown, 899 F.2d 189, 192 (2d Cir.1990) (comparing 18 U.S.C. § 17(a) to the predecessor defense recognized in federal courts). Where the original § 13A-3-1(a) had both a `cognitive' test (lack of capacity to appreciate the criminality of the conduct) and a `volitional' test (lack of capacity to conform one's conduct to the requirements of the law), the new § 13A-3-1(a) has only a `cognitive' test (inability to appreciate the nature and quality or wrongfulness of one's acts). See United States v. Brown, 899 F.2d at 192; United States v. Cameron, 907 F.2d at 1061.
"While the new § 13A-3-1(a) contains only the `cognitive' test, the defendant must make a two-part showing to meet this test. `First, he must establish that he suffered from a serious mental disease or defect at the time of the crime. Second, his mental disease or defect must have prevented him from appreciating the nature and quality or wrongfulness of his acts.' United States v. Knott, 894 F.2d 1119, 1121 (9th Cir.), cert. denied, [498] U.S. [873], 111 S.Ct. 197, 112 L.Ed.2d 158 (1990) (citations omitted) (emphasis added). The defendant must prove both prongs of this test `by clear and convincing evidence.' § 13A-3-1(c) (Supp.1990).
"While new § 13A-3-1(a) contains a much more restrictive definition of insanity than that under which we previously operated, the general principles of law regarding the defense of insanity remain unchanged. Those principles have been summarized as follows:

*341 "`1. By statute, there is a presumption of sanity extending to all persons over the age of 14.
"`2. The defense of insanity is an affirmative defense. The burden of proving this defense rests upon the defendant and never shifts to the state.
"`3. The burden upon the defendant is to establish the issue of legal insanity by [clear and convincing evidence] and to the reasonable satisfaction of the jury.
"`4. The question of insanity at the time of the commission of the crime is a matter to be determined by the jury from a consideration of all the evidence.
"`5. In making its determination, the jury may reject all expert testimony though it is without conflict.
"`6. However, opinion testimony, even of experts, must be weighed by the jury and may not be arbitrarily ignored.
"`....
"`The one exception to these rules is found in those cases where the proof of insanity is overwhelming and uncontradicted.
"`"Cases of insanity may be so clear, the proof so strong and undisputed, that the jury should be instructed in like form." Boyle v. State, 229 Ala. 212, 222, 154 So. 575, 583 (1934).'

"Herbert v. State, 357 So.2d 683, 688-89 (Ala.Cr.App.), cert. denied, 357 So.2d 690 (Ala.1978). See also Christian v. State, 351 So.2d 623, 624-25 (Ala.1977); Ellis v. State, 570 So.2d 744, 749-753 (Ala.Cr.App.1990)."
584 So.2d at 942-43. See also Williams v. State, 710 So.2d 1276 (Ala.Crim.App.1996) (holding that the 1988 change in the definition of insanity, eliminating the volitional prong from the statute, did not render it constitutionally inadequate).
At trial, Dr. Dixon testified that, when Archie was admitted to Bryce Hospital, she was "floridly psychotic, and [was] stabilized on anti-psychotic medications." (R. 181.) Dr. Dixon stated that "floridly psychotic" meant "[b]latant psychotic systems, out of touch with reality, hallucinating and delusional belief systems. What you think of when you think of somebody who is severely mentally ill." (R. 181.) Archie was diagnosed with paranoid schizophrenia. According to Dr. Dixon:
"The preeminent symptoms for paranoid schizophrenia is that while you are basically cognitively intact, you suffer with a major delusional system. A delusional system is a false belief system. It is when you believe something is true, just like if you believed you were in a courtroom right now listening to me talk, you believe that as much as is possible. Mrs. Archie believed that God was talking to her, and that her daughter was inhabited by Satan, and she had a lot of odd and unusual religious overtones to her delusional beliefs."
(R. 182.) Dr. Dixon testified that he had evaluated Archie to determine her mental state at the time of the shooting, and that she was "suffering with the ill effects of a very severe mental illness." (R. 188.) He stated that Archie's "basis in reality, her ability to know right from wrong and to apply common sense and good judgment was severely compromised and impaired." (R. 194.) However, when asked whether she was capable of intentional behavior, Dr. Dixon stated that "intent is a legal term. I prefer to use goal-directed behavior. She was quite capable of goal-directed behavior, yes." (R. 204.) Dr. Dixon also testified that Archie "knew that if [sic] *342 shooting someone would kill them, and she knew that shooting and killing someone was a sin and was also a moral wrong and a crime. She was aware of that."[3] (R. 204.)
In Herbert v. State, 357 So.2d 683 (Ala. Crim.App.1978), the appellant, a member of the Mormon church, shot and killed his wife because he claimed she was possessed and because he believed she was controlling his mind. In Herbert, the trial court "refuse[d] to give the affirmative charge and instruct the jury that the evidence of insanity was so clear and the proof so strong and undisputed that they were bound to accept such testimony of insanity." Id. at 684. This Court, noting that expert testimony indicated that the appellant was insane, held that there was nothing before the jury to rebut the evidence of insanity. This Court stated that the only evidence indicating that the appellant was sane was the mere presumption of sanity.[4]
Unlike the evidence found to be conclusive in Herbert, here, although it was uncontroverted that Archie was suffering from a serious mental illnessparanoid schizophreniaat the time of the shooting, there was conflicting evidence as to whether she was able to appreciate the nature and quality or wrongfulness of her actions.[5] As is stated above, Dr. Dixon testified that Archie "knew that if [sic] shooting someone would kill them, and she knew that shooting and killing someone was a sin and was also a moral wrong and a crime. She was aware of that." (R. 204.) Additionally, several excerpts from *343 Archie's statement to the police are relevant to our resolution of this issue. In Archie's interview with the police, the following exchange occurred:
"Q: What did you pull your gun out for?
"[Archie]: I had to do the Lord's Will, I was led to get rid of her.
"Q: I understand that but did the Lord tell you to get rid of her?
"[Archie]: He didn't, I had to do his will I had to get rid of Satan cause she was worshipping Satan and she was destroying everybody and my spirit and soul couldn't be released until I
"Q: Are you saying you read a part in the Bible that told you what to do or is that what you're saying?
"[Archie]: Yes, I kept praying and asking God, I ask him which way."
(C. 56.)[6] One inference that can be gleaned from this excerpt is that Archie believed that she was interpreting God's will when she shot her daughter, rather than following a perceived directive from God to kill her daughter. The following exchange also occurred during Archie's interview with the police:
"Q: You know what you've done, you know that you have shot your daughter?
"[Archie]: Yes I ask for forgiveness before I done it and then I begged and ask for forgiveness after I done it.
"Q: But you just felt like that was something you had to do is that right?
"[Archie]: I feel like I was doing the Lord's will.
"Q: How do you feel about it now?
"[Archie]: I don't feel burdened down, I don't feel real sad, but I keep thinking about it you know, she seemed like an evil person, she talked to me evil, my husband evil, but when she said I love you, it just felt different cause I love don't hardly come out of her mouth, she just hated.
"....
"Q: But now you feel like everything is okay now, right?
"[Archie]: Yes, I feel that I done what the Lord ask me to do, I feel like my heart is pure now that I done what the Lord.
"Q: Now let me ask you this, you knew and still know, like you said you are not under any kind of drugs or anything like that to alter your thinking whatsoever, so what I'm saying you knew what you were doing is that right, I mean you knew what you were doing?
"[Archie]: Yes, I knew I was doing the will of the Lord."
(C. 56.)[7] When read in conjunction with the first excerpt noted above, this excerpt, in which Archie states that she asked for forgiveness before and after shooting her daughter, indicates that Archie knew that killing her daughter was wrong and a sin in the eyes of God. Additionally, although we are in no position to engage in a theological analysis of Archie's apparent religious beliefs, it would appear that the jury could have reasonably questioned whether Archie really believed that God had directed her to commit the act, given the logical assumption that she would not have needed forgiveness, because acting on a directive from God would not constitute a sin or a moral wrong. The jury could have *344 also reasonably questioned whether Archie had asked for forgiveness because she could have been uncertain as to her interpretation of God's will.
This is a particularly tragic and troubling case. The record indicates that Archie was unquestionably suffering from a severe mental illness when she killed her daughter; the State does not argue otherwise. However, the law in Alabama is clear. Archie had to prove by clear and convincing evidence that she was unable to appreciate the nature and quality or wrongfulness of her acts. Resolution of any conflicts in the evidence is, of course, for the jury. The above-cited excerpts from Archie's interview with the police, coupled with Dr. Dixon's statements, provided conflicting evidence as to whether Archie was able to appreciate the nature and quality or wrongfulness of her acts. Therefore, the trial court correctly denied Archie's motion for a judgment of acquittal and submitted the issue of her sanity to the jury.
As for Archie's argument that the verdict was contrary to the weight of the evidence, "[a]ny issues regarding the weight and credibility of the evidence are not reviewable on appeal once the state has made a prima facie case." Jones v. State, 719 So.2d 249, 255 (Ala.Crim.App. 1996), aff'd, 719 So.2d 256 (Ala.1998). "`"[T]he credibility of witnesses and the weight or probative force of testimony is for the jury to judge and determine."`" Johnson v. State, 555 So.2d 818, 820 (Ala. Crim.App.1989), quoting Harris v. State, 513 So.2d 79, 81 (Ala.Crim.App.1987), quoting in turn Byrd v. State, 24 Ala.App. 451, 136 So. 431 (1931). "We have repeatedly held that it is not the province of this court to reweigh the evidence presented at trial." Johnson, 555 So.2d at 820. "`When the jury has passed on the credibility of evidence tending to establish the defendant's guilt, this Court cannot disturb its finding.'" Rowell v. State, 647 So.2d 67, 69 (Ala.Crim.App.1994), quoting Collins v. State, 412 So.2d 845, 846 (Ala.Crim. App.1982).
Based on the foregoing, the judgment of the trial court is affirmed.
AFFIRMED.
McMILLAN, P.J., and BASCHAB, J., concur. SHAW, J., concurs specially, with opinion, which WISE, J., joins. COBB, J., dissents, with opinion.
SHAW, Judge, concurring specially.
I concur in the per curiam opinion.
I write specially to emphasize my concern over the particularly troubling and tragic circumstances surrounding this casea concern I know is shared by all of the judges on this Court. As the judge who granted oral argument and who subsequently authored the per curiam opinion for this Court, I have been concerned from the outset that Teresa Ann Archie may have been entitled to a judgment of acquittal based on her defense that she suffered from a mental disease or defect. It became apparent to me early on that the undisputed evidence presented at trial indicated that Archie was mentally ill when she shot and killed her daughter (a fact the State concedes) and that by virtue of delusions resulting from that mental illness she was unable to conform her conduct to the requirements of the law. I believe that Judge Cobb correctly concludes in her dissent that Archie "was acting solely within the framework of her deeply disturbed delusional system." 875 So.2d at 348.
However, I must respectfully disagree with Judge Cobb's conclusion that "[t]he testimony in this record permits only the conclusion that Teresa Ann Archie was insane before she shot her daughter, she *345 was insane at the time of the shooting, and she was insane after she shot her daughter." 875 So.2d at 350. I think I could vote to reverse the conviction and render a judgment for Archie if the former Alabama insanity statute was applicable here. However, the original § 13A-3-1(a), which had both a cognitive test (lack of capacity to appreciate the criminality of the conduct) and a volitional test (lack of capacity to conform one's conduct to the requirements of the law), does not control this case. The new, more restrictive, § 13A-3-1(a), which has only a cognitive test (inability to appreciate the nature and quality or wrongfulness of one's acts), sets out the standard by which the evidence in this case must be judged. See Ware v. State, 584 So.2d 939 (Ala.Crim.App.1991).
As noted in the per curiam opinion, and chronicled in more detail in the dissent, the record contains undisputed evidence indicating that Archie was not only suffering from a mental illness at the time of the shooting, but also that, based on her distorted sense of reality, she was unable to resist her compulsion to do what she perceived to be God's willto kill her daughter. However, there was evidence (Archie's statements to the police and, more importantly, Dr. Dixon's testimony) from which the jury could have found that Archie was nonetheless able to appreciate the nature and quality or wrongfulness of her acts. It appears that the jury did, indeed, find Dr. Dixon's testimony persuasive and that it did find that Archie was fully aware that shooting her daughter could kill her and that shooting and killing her daughter was both legally and morally wrong. Like Judge Cobb, I must seriously question whether Archie truly comprehended the legal and moral ramifications of killing her daughter; however, I believe that Archie's statements and Dr. Dixon's testimony created a conflict in the evidence. Resolution of conflicts in the evidence is for the finder of fact. Based on the law as I understand it today, I can only conclude that the question of Archie's sanity was for the jury. Therefore, I concur in affirming the trial court's judgment.
COBB, Judge, dissenting.
The majority holds that the trial court correctly denied Archie's motion for a judgment of acquittal and rejects her argument that the verdict was contrary to the weight of the evidence. Although acknowledging that "[t]his is a particularly tragic and troubling case" 875 So.2d at 344, the majority finds that the record provided conflicting evidence regarding whether Archie could appreciate the nature and quality or wrongfulness of her acts, and that the resolution of the conflicts was for the jury to resolve. I agree that this case is particularly troubling and tragic. The picture of a teenaged girl begging for her life as she is chased and shot by her severely mentally ill mother presents facts easily characterized as among the most disturbing I have reviewed in my years as a judge. I find equally disturbing, however, the majority's resolution of this case, and I must dissent.
Although the majority has quoted relevant portions of the trial testimony and of Archie's statement to the police, additional portions of the testimony and of Archie's statement are relevant to my analysis of the case. For example, in the statement she made to the police just hours after the murder, Archie stated that in the weeks preceding the murder she had stopped taking the medication prescribed by her "mental illness doctor," and that she had again suffered from depression. (Statement at p. 4.) Archie stated that the Spirit of God spoke to her in her mind, and she could ask for things and receive them. (Statement at p. 5.) Archie said that the voice in her head "told me how to do the *346 Will of the Lord" and she said she felt she was led to do his will, which was "to get rid of her." (Statement at pp. 6, 8, 12.) When the investigator asked Archie whether the Lord told her to "get rid" of her daughter, Archie replied, "He didn't, I had to do his Will. I had to get rid of Satan cause she was worshipping Satan and she was destroying everybody and my spirit and my soul couldn't be released until I." (Statement at p. 8.) After she shot her daughter, Archie said, she ran down the road: "I went to the end of the road to the stop sign, and I just shouted and I said Lord you said your Will had to be done, I done your will Lord...." (Statement at p. 12.)
The majority contends that portions of Archie's statement suggest that she was interpreting God's will, rather than following a perceived directive from God. 875 So.2d at 343.[8] However, that interpretation cannot stand in light of Archie's clear and repeated assertions that the Lord was speaking to her regularly and was directing her to "get rid of" her daughter, who Archie believed was worshipping Satan because she had a book by the author Stephen King.
Other portions of Archie's statement clearly demonstrate her lack of contact with reality and that she was delusional and experiencing hallucinations. For example:
"Q: What's wrong with your daughter?
"A: For trying to deny me and keeping everybody in bondage in sin because I feel like last year I had died, I feel it in my head and something and I sort of over heard her saying `yea, she died' and I don't know if she give me something and I come back to life. She said `she come back but I seen the blood,' I could just hear her, that's sounds like what she was saying but I don't know for sure.
"Q: When was that?
"A: That was last year and I moved on down to my mother's because the Lord had dealt with me and the police's and stuff was chasing me and I went to the mental place and then I been down at Regional Hospital and my daughter said on she put down on the report that I had been coloring on it, but I hadn't been coloring on it I could just hear people talking to me."
(Statement at p. 6.)
Similarly, the majority acknowledges that Dr. Joe Dixon testified that Archie was "floridly psychotic" when she was admitted to Bryce Hospital and that her ability to know right from wrong was severely compromised. Dr. Dixon's testimony provided a wealth of information, however, that I believe was not detailed sufficiently in the majority opinion. Therefore, portions of Dr. Dixon's testimony are set out below.
First, it is significant, in my opinion, that Dr. Dixon was an employee of the State of Alabama, the chief of psychological assessment on the admissions unit at Bryce Hospital, when Archie was admitted to Bryce for evaluation. Teresa Archie was admitted to Bryce Hospital in 1996, and she was not discharged until 1999. (R. 201.) Dr. Dixon testified that when Archie was admitted to the facility, she was floridly psychotic; she was "out of touch with reality, hallucinating and [had] delusional belief systems." (R. 181.) Dr. Dixon testified that years before her admission to Bryce, Archie had been diagnosed with paranoid schizophrenia, and the Bryce treatment team diagnosed her with *347 that disease upon her admission. Dr. Dixon explained that a paranoid schizophrenic is "basically cognitively intact," but has a false belief system. He explained:
"It is when you believe something is true, just like if you believed you were in a courtroom right now listening to me talk, you believe that as much as is possible. Mrs. Archie believed that God was talking to her, and that her daughter was inhabited by Satan, and she had a lot of odd and unusual religious overtones to her delusional beliefs."
(R. 182.) Archie was initially too unstable mentally to return to court and had to receive treatment to stabilize her and to render her competent to stand trial.
Dr. Dixon evaluated Archie's mental state at the time of the offense. He testified from the forensic evaluation report he had prepared:
"Compulsive delusional thinking was apparent in that she believed that she was driven to the `work of the Lord.' She was laboring under a profound defect of rational reason such that she believed that her daughter was possessed by Satan, and that God wanted her to rid her from Satan and all his influences. She related that she tried to fight again this command from God but was unable to resist. ... Further, these descriptions of her thinking and emotional state during the time in question are consistent with ... clinical impressions and [the] judgment of the treatment staff at Bryce Hospital who diagnosed Mrs. Archie with a major mental disorder which entails loss of contact with reality."

(R. 186.)(Emphasis added.)
Dr. Dixon explained that he consulted with other clinical professionals who had daily contact with Archie and observed her for more than 60 days while she was at Bryce Hospital following the murder. Dr. Dixon said that he asked the other professionals if they were certain that Archie was not "faking" her illness because, he said, "mental illness as an explanation for committing a murder is really quite rare." (R. 189-90.) Dr. Dixon said that neither he nor any of the other mental health professionals saw any evidence of faking or malingering during Archie's three years at the hospital. (R. 207.) Dr. Dixon reviewed the case notes completed by the law enforcement officer who investigated the shooting, Archie's videotaped interview with the police, and the offense report completed during the investigation. Dr. Dixon interviewed the prosecutor; he said that the prosecutor "had indicated to me that the jail staff and [he] had seen odd and unusual behavior in Mrs. Archie, and they had worked with Judge Fielding to get her put into the hospital." (R. 190.) Archie received anti-psychotic medication while she was at Bryce, and "intensive counseling" from the treatment team. Dr. Dixon testified that "Mrs. Archie's condition is so chronic that she needs long term [care], and so severe that we believe [at] the hospitalthat she would require on-going medical care for the rest of her life." (R. 192.)(Emphasis added.) Dr. Dixon testified that, based on his consultation with the entire clinical team, he believed that Archie was severely mentally diseased at the time of the shooting. Dr. Dixon further stated that Archie was a rare example and that he did not report this finding very often in any client. (R. 206.)
In response to the prosecutor's question regarding whether Archie understood that the "natural consequences" of pointing a gun and firing it at her daughter would be to kill her daughter, Dr. Dixon replied, "Well, actually her intent was to relieve her daughter of the possession of Satan. The natural consequence would be if you shoot someone they will die. Mrs. Archie *348 was focused more on freeing her daughter from the clutches of Satan." (R. 203.)(Emphasis added.)
As for Archie's prognosis, Dr. Dixon stated that paranoid schizophrenics who are properly medicated and treated "have the best likelihood for occupational functioning and for living independently in the community once they have been stabilized and stay on their medications." (R. 193.) He said that there was a possibility that Archie's condition would regress if she stopped taking her medication. (R. 193.) Dixon concluded that Archie's "ability to know right from wrong and to apply common sense and good judgment was severely compromised and impaired." (R. 194.)
Dr. Dixon testified that nothing in Archie's records indicated that Archie was told that she could stop taking her medication before the shooting. Rather, he stated that it is not uncommon for paranoid schizophrenics to quit taking their medication because the side effects to the medication can be severe, and because "when you are dealing with people with delusional systems they incorporate events and people into their false belief systems." (R. 196.) He further explained:
"Remember, they are paranoid, have unrealistic fears and worries, and they are hypervigilant about things; so very often you will find that they will think I am not going to take that medication because the doctor is now trying to poison me, and they become unmedicated, and their delusion even becomes worse."
(R. 197.)
Additional testimony about Archie's condition was presented at trial. Nancy Adkins, the neighbor whom Archie told she killed Shavon, testified that when she first saw Archie that day, Archie was approximately one-half mile from her house and she was repeatedly stating "the Lord is good." Adkins said that Archie's behavior seemed strange, but that what Archie "was saying sort of went along with her body language to me. I could tell that she was excited or agitated." (R. 76.) After they went to Archie's house, "Teresa was kind of walking around a ways from us and she seemed to be unaware that Shavon was on the ground." (R. 72)(emphasis added). She made no attempt to check on Shavon's condition.
The majority holds that the evidence as to whether Archie could appreciate the nature and quality or wrongfulness of her actions was conflicting. The majority also states that the jury could have reasonably questioned whether Archie believed that God had directed her to act, because she had also asked for God's forgiveness. The record refutes these assertions. Although the majority correctly notes that Dr. Dixon testified that Archie knew that shooting and killing someone was a sin and a crime, he also testified that Archie's intent in firing the gun at her daughter was to free her daughter from Satan. He further stated that Archie believed that God wanted her to free her daughter from Satan, and she was unable to resist the perceived command from God. The evidence at trial established only that Archie was suffering from a severe, chronic, debilitating mental illness that required years of hospitalization before Archie was stabilized enough to be returned to court to stand trial. She was acting solely within the framework of her deeply disturbed delusional system. The majority's speculations about conclusions the jury might have drawn are, I believe, unwarranted in light of all of the evidenceboth expert and nonexpert that was presented at trial. And it clearly ignores the testimony of Dr. Dixon, who stated that Archie's "intent was to relieve her daughter of the possession of Satan," and that "Archie was focused more on freeing her daughter from the clutches of *349 Satan." (R. 203.)[9] The witness who saw Archie immediately after the crime testified about her aberrant behavior, and her behavior continued to be so bizarre that jail personnel and the prosecutor endeavored to secure Archie's transfer to a psychiatric hospital, where she remained for three years. I find Judge Bowen's words in a similar case particularly instructive:
"In contrast to the foregoing decisions and others in which we have held that the evidence of the accused's insanity was not overwhelming and that, in finding the accused sane, the jury did not arbitrarily ignore the expert testimony, we cannot escape the conclusion in this case that the evidence of the appellant's insanity was both overwhelming and uncontradicted. The verdict of guilt indicates that the jury must have arbitrarily ignored the testimony regarding the appellant's mental state.
"The expert opinion in this case, as distinguished from that in Ellis [v. State, 570 So.2d 744 (Ala.Crim.App.1990)] and Bui [v. State, 551 So.2d 1094 (Ala.Crim. App.1988), aff'd, 551 So.2d 1125 (Ala. 1989), vacated on other grounds, 499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712 (1991)], was not weak, inconclusive, or methodologically flawed. Dr. Rivenbark's opinion about the appellant's mental state was not based primarily on the appellant's description of her own symptoms, but on psychological tests, a social and family history, `a CT scan' of the appellant's brain, a drug screen, and voluminous records outlining the nearly identical conclusions of four other mental health professionals that the appellant was psychotic.
"In contrast to Bass [v. State, 585 So.2d 225 (Ala.Crim.App.1991)], Ware [v. State, 584 So.2d 939 (Ala.Crim.App. 1991)], Sistrunk [v. State, 455 So.2d 287 (Ala.Crim.App.1984)], Cunningham [v. State, 426 So.2d 484 (Ala.Crim.App. 1982)] and other cases in which we determined that the sanity of the accused could be inferred from the circumstances surrounding the offense, the circumstances of the offense alleged here do not imply a sane actor. An inference of sanity could be applied to the defendants in the foregoing cases because they appeared to be prompted by the recognizable motives of revenge, anger, or jealousy. However, it is clear here, as it was in Clark v. State, 475 So.2d 657, 659 (Ala.Crim.App.1985), and Alvis v. State, 434 So.2d 859, 864 (Ala.Crim. App.1983), that the appellant's actions against Officer Williams were `bizarre, unprovoked, and without a rational basis.'
"The appellant's conduct on the night of August 4, 1991, did not indicate a consciousness of guilt or an attempt to conceal wrongdoing. The State's argument at trial that the appellant's sanity was demonstrated by her saying to Officer Williams, `I've got you now, Bitch,' R. 109, is not supported by the evidence. While the appellant's statement was plainly indicative of her intent to assault Officer Williams, it was also clearly consistent with the evidence that the appellant was suffering from a delusion that the assault was necessary to ensure the appellant's safety." *350 Dixon v. State, 668 So.2d 65, 71-72 (Ala. Crim.App.1994).
The Court in Dixon then held:
"We conclude, as we did in Herbert v. State, 357 So.2d 683, 689 (Ala.Cr.App.), cert. denied, 357 So.2d 690 (Ala.1978), that there was
"`nothing before the jury to rebut the great mass of testimony directly showing actual insanity before, at the time of, and after the act in question. In other words, there were simply no facts from which opposing inferences might have been rationally drawn.'
"The appellant was entitled to have a judgment of acquittal entered in her behalf."
Id. at 72-73.
The record before us requires the same result. Only the single statement from Dr. Dixon regarding Archie's awareness of the consequences of firing a gun and shooting someone supports the majority's resolution of this case. And the majority's reliance on that selected statement, I believe, ignores the wealth of testimony from Dr. Dixon and the other witnesses that established that Archie was psychotic and that she was suffering from a "profound defect of rational reason." (R. 186.) The testimony in this record permits only the conclusion that Teresa Ann Archie was insane before she shot her daughter, she was insane at the time of the shooting, and she was insane after she shot her daughter. "The evidence supports only one logical conclusion: her actions sprung from an insane mind. Moreover, all intentional murders have planning, whether it be merely picking up a knife or buying a gun." Janezic v. State, 723 So.2d 696, 724 (Ala.Crim.App.1996)(Patterson, J., dissenting), rev'd, 723 So.2d 725 (Ala.1997). The jury ignored the overwhelming evidence regarding Archie's mental state that demonstrated that Archie could not appreciate the nature and quality or wrongfulness of her acts. Archie is entitled to a judgment of acquittal.
I find it remarkable and tragic that another statement from Judge Patterson's eloquent dissent in Janezic is again applicable: "This court has today raised the standard of review in insanity cases to a height that no defendant can possibly reach. The undeniable effect of the majority's decision is that a jury's rejection of the insanity defense is no longer reviewable in Alabama." Janezic v. State, 723 So.2d 696, 725 (Ala.Crim.App.1996)(Patterson, J., dissenting).
I believe that the record demonstrates overwhelming evidence that Archie's severe and chronic psychotic state prevented her from appreciating the nature and quality or wrongfulness of her acts, and I further believe that Archie is entitled to a judgment of acquittal. Additionally, I find that this tragic case presents the opportunity to urge the Legislature to consider a means to avoid such an unfortunate, unconscionable situation in future cases. My research and consideration of numerous statutes, cases, and secondary authorities has led me to conclude that a statutory scheme permitting a "guilty but mentally ill" ("GBMI") verdict should be enacted by this State. Several states have enacted legislation permitting a plea or verdict of guilty but mentally ill when the defendant is determined to be guilty of the offense charged and is mentally ill, though not legally insane.[10] The statutes provide that *351 a defendant who is found guilty but mentally ill may have any sentence imposed that may lawfully be imposed on a defendant convicted of the same offense without a finding of mental illness. The statutes also generally provide, with varying degrees of specificity, that the mentally ill offender shall undergo further evaluation and treatment, including commitment to a mental health facility, as is deemed necessary by mental health workers and corrections officials.
GBMI statutes have withstood challenges on grounds that they violate equal protection, deny due process, and impose cruel and unusual punishment. E.g., State v. Neely, 112 N.M. 702, 819 P.2d 249 (1991); People v. DeWit, 123 Ill.App.3d 723, 79 Ill.Dec. 188, 463 N.E.2d 742 (1984); State v. Baker, 440 N.W.2d 284 (S.D.1989). Support for the underlying purpose for the statute exists. For example, in Sanders v. State, 585 A.2d 117, 126 (Del.1990), the Delaware Supreme Court observed that a defendant who is merely guilty merits punishment; a defendant whose appreciation and understanding of his actions are so overwhelmed by disease that he is declared "not guilty by reason of insanity" needs treatment; and a defendant whose willpower was undermined by his mental disease should receive treatment and punishment"treatment because he is ill and punishment because he might, in theory at least, have resisted the urge to commit the crime of which he has been convicted."
Other opinions about the GBMI verdict are far less favorable. The authors of one legal treatise have written:
"It surely makes no sense for commitment procedures to be triggered by a jury verdict based on evidence concerning the defendant's past rather than present mental condition and need for treatment. Decisions concerning the proper placement of incarcerated offenders should be made by correctional and mental health authorities, not by juries or trial judges."
1 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 4.5 (1986). Similarly, a justice of the Illinois Supreme Court expressed his disapproval of the verdict:
"GBMI is a meaningless verdict which dupes the jury into believing that there is a middle ground between guilty and not guilty by reason of insanity. In reality, the GBMI verdict is no different from a guilty verdict. Presenting this option to the jury encourages compromise verdicts and injects irrelevant sentencing considerations into the jury's determination of defendant's criminal culpability. Such results are incompatible with due process of law."
People v. Lantz, 186 Ill.2d 243, 263, 238 Ill.Dec. 592, 602, 712 N.E.2d 314, 324 (1999)(Heiple, J., dissenting).
While I acknowledge that a GBMI verdict is not universally supported by judges and legal scholars, I believe that the Alabama Legislature could, and should, enact a GBMI statute that would protect all of the citizens of the State. That is, I believe a statute can be drafted that would allow a jury to find a defendant guilty, but would also permit the jury to acknowledge that mental illness (which affects thousands of Alabamians) affected the defendant's behavior when the crime was committed. This legislation must also provide for sentencing and treatment options available to those found GBMI. The statutes enacted by the Delaware legislature, Del.Code Ann. tit. 11, § 408 (2001), and by the Pennsylvania legislature, 18 Pa. Cons.Stat. Ann. *352 § 314 (West 1998), provide detailed provisions for the confinement, treatment, and discharge of those found GBMI, and would be excellent models for the Alabama Legislature to follow. A statute implementing a GBMI verdict would, I believe, provide juries with a necessary option that would benefit the criminal justice system, mentally ill defendants, and the public in general.
In conclusion, the judgment against Archie should be reversed and a judgment of acquittal should be entered because the evidence that Archie was insane when she shot her daughter was overwhelming and conclusive. Furthermore, I encourage the Legislature to enact a statute providing for a guilty but mentally ill verdict, which will address the injustices in the present system, which permits a seriously mentally ill defendant such as Teresa Archie to languish in prison, deprived of the mental health treatment she so desperately needs and deserves.
For the foregoing reasons, I dissent.
NOTES
[1] The victim's name is variously spelled "Shavon," "Shavonne," and "Sharon" in the trial transcript and clerk's record. For the sake of consistency, we have adopted the court reporter's spelling.
[2] During Dr. Dixon's testimony at trial, there were repeated references to a report he had compiled for the trial court on March 3, 1997. In addition, in Archie's motion for a court-ordered mental evaluation to determine her mental status at the time of the offense, Archie stated that the report was submitted to the trial court in 1997. (C. 21.) However, the report itself was not made a part of the record on appeal.
[3] "[Prosecutor]: Okay. And by the same token as a result of your examination, you have no reason to doubt that at least to some degree and on some level the Defendant could understand and appreciate right from wrong?

"[Dr. Dixon]: She was in a great deal of anguish and internal anxiety and turmoil. God was telling her in her delusion to kill her daughter, but God also has told her and all of us Thou Shalt Not Kill. So, we are getting conflicting instructions here from God in Teresa's mind. She knew at the time, I believe, that to shoot her daughter, kill her daughter, and that
"Court Reporter: I'm sorry? She knew at the time, I believe, that to shoot her daughter, kill her daughter, and that
"[Dr. Dixon]: Yes. She knew that if shooting someone would kill them, and she knew that shooting and killing someone was a sin and was also a moral wrong and a crime. She was aware of that."
(R. 204.)
[4] Herbert was decided before the definition of insanity was changed in Alabama.
[5] We need not precisely delineate the parameters of the definitions of "nature," "quality," "wrongfulness," and "appreciate," as these words are used in § 13A-3-1, because it is apparent that there was conflicting evidence as to whether Archie was insane regardless of exactly how those words are defined. We note that "nature" is defined in Black's Law Dictionary 1050 (7th ed.1999) as follows: "A fundamental quality that distinguishes one thing from another; the essence of something." "Quality" is defined in The American Heritage Dictionary of the English Language (4th ed.2000) as "an inherent or distinguishing characteristic; a property ... Essential Character; nature." In Ivery v. State, 686 So.2d 495 (Ala.Crim.App.1996), this Court, although noting that the definition of "wrongfulness," as that term is used in § 13A-3-1, remained an open question in Alabama, nonetheless indicated that "wrongfulness" could be defined as relating to a defendant's appreciation of moral and legal wrongfulness.

This Court also noted in Ivery, at 502, that the issues of "wrongfulness" of conduct and "appreciation" of conduct are separate and distinct. In Ivory, we cited Brown v. State, 686 So.2d 385, 402 (Ala.Crim.App.1995), in which this Court approved a trial court's penalty-phase jury instructions, which stated that "`"[a] person may indeed know that doing the act that constitutes a capital offense is wrong and still not appreciate its wrongfulness because he does not fully comprehend or is not fully sensible to what he is doing or how wrong it is."`" 686 So.2d at 502.
[6] A transcript of Archie's statement to the police was introduced into evidence as State's exhibit 37. That transcript is included in the record on appeal, but only the first page of that transcript is enumeratedpage 56. The preceding excerpt was from pages 8-9 of Archie's statement.
[7] The preceding excerpt was from pages 13-14 of Archie's statement.
[8] From a legal standpoint, I find this to be a distinction without a difference.
[9] Moreover, as Judge Patterson observed in a dissent with which I joined: "If the motive arose at a time when the defendant was severely mentally ill, as in this case, then reasonably the motive evidence can have no probative value as tending to show that the defendant was sane at the time of her act pursuant to that motive (i.e., that she was able to appreciate the wrongfulness of her act)." Janezic v. State, 723 So.2d 696, 722 (Ala.Crim.App.1996)(Patterson, J., dissenting), rev'd, 723 So.2d 725 (Ala.1997).
[10] Alaska Stat. § 12.47.030 (Michie 2002); Del.Code Ann. tit. 11, § 408 (2001); Ga.Code Ann. § 17-7-131 (1997); 725 Ill. Comp. Stat. Ann. 5/115-2 (West 2000); Ind.Code Ann. § 35-36-2-3 (Michie 1998); Ky.Rev.Stat. Ann. § 504.120 (Michie 1999); N.M. Stat. Ann. § 31-9-3 (Michie 2000); 18 Pa. Cons. Stat. Ann. § 314 (West 1998); S.C.Code Ann. § 17-24-20 (Law. Co-op.2001 Supp.); S.D. Codified Laws § 23A-7-2 (Michie 1998); Utah Code Ann. § 77-16a-103 (2001 Supp.) (guilty and mentally ill verdict).