[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-11905

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 4, 2010
JOHN LEY
CLERK

D. C. Docket No. 04-00681-CV-WS-C

JASON O. WILLIAMS,

Petitioner-Appellant,

versus

RICHARD F. ALLEN,
Commissioner, Alabama
Department of Corrections,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

**(March 4, 2010)**

Before TJOFLAT, BLACK and WILSON, Circuit Judges.

WILSON, Circuit Judge:

Jason Oric Williams, an Alabama death row inmate, appeals from the district court's denial of his petition for a writ of habeas corpus ("petition"), filed pursuant to 28 U.S.C. § 2254. The district court granted a certificate of appealability ("COA") on the sole issue of whether Williams' counsel rendered ineffective assistance by: (1) presenting an invalid defense under Alabama law; (2) failing to sufficiently argue a voluntary intoxication defense to negate intent to murder; and (3) failing to object to jury instructions. After review of the record and with the benefit of oral argument, we affirm the district court's denial of Williams' petition.

## I. BACKGROUND

*A. The Crimes*

Williams was adopted by his aunt and uncle at infancy. His aunt and uncle did not disclose to Williams that they were not his biological parents. Williams grew up in poverty, performed poorly academically, and felt he was snubbed by his family and peers. When Williams turned seventeen years old, he attempted to obtain identification documents so that he could work. During this process, Williams learned that he was adopted. This news devastated Williams, and he

began experimenting with alcohol and drugs such as LSD, crack, marijuana, ecstacy, and prescription medications.

In 1990, Williams married Sandra Ellzey. Williams and Ellzey remained married for about ten months, divorcing in 1991. On a few occasions, Williams slapped Ellzey in the face, pulled her hair, and broke her glasses. Williams, however, continued to live with Ellzey after they were divorced. In January 1992, Ellzey discovered needles for drug use in her home, and learned that Williams had been taking her tranquilizers. Ellzey then asked Williams to leave.

When Ellzey forced Williams to move out, Gerald and Clara ("Clair") Paravicini, who had known Williams for about eight years, allowed Williams to move into their home with them and Clair's minor son, Jeffery Carr. Williams resided in the Paravicini home for approximately two weeks.

Shortly after moving in with the Paravicinis, Ellzey and Williams agreed to re-unite and move in together. On February 14, 1992, they arranged a date. The couple went to a club and had a few drinks. Afterwards, they bought sandwiches at a deli. By 11:00 p.m., Ellzey was ready to return home. However, Williams was not, and he asked Ellzey to drop him off at another club. Ellzey advised Williams to call her when he was ready to leave the club so that she could give him a ride home. At the club, Williams purchased LSD, and prescription drugs,

and he drank a large amount of liquor.[1]   The record is clear that Williams ingested drugs and alcohol throughout the night.   Rather than call Ellzey to pick him up as they had agreed, Williams met with some friends, and they drove to a drug-house to smoke crack cocaine together all night.  Early the next morning, Williams' friend dropped him off at a corner store.  Williams then walked about a half-mile back to the Paravicinis' trailer home.

On February 15, at approximately 6:00 a.m., Williams arrived at the Paravicinis' home, and he knocked, either on Jeffery's window or on the side of the trailer that corresponded with Jeffery's room.  Jeffery let him in and asked him about his plans for the day.  Williams told Jeffery that he had a "side job" to do. Jeffery thought that Williams seemed normal and did not appear to be drunk because he was neither tilting his head nor slurring his speech.  Williams then called Ellzey on a cordless telephone.  Ellzey was upset with Williams because she had wanted him to return to her house and because they had planned for her to come and pick him up from the bar.  Ellzey, who had observed Williams inebriated many times in the past, did not believe that Williams was intoxicated.

---

[1]   According to Williams' statement to law enforcement officials on February 16, 1992, the day after the murders, he had a few drinks with Ellzey and then drank liquor all night at the club.  While at the club, he bought two round, yellow pills from someone named Teddy.  He did not know whether the pills were ecstacy or LSD, but believed that they were LSD. On February 15, he believes that he took the pills between 3:00 and 5:00 a.m.

Jeffery watched Williams pacing while he talked to Ellzey. While still on the phone with Ellzey, Williams walked into the Paravicinis' bedroom, where Clair was in bed, and retrieved a .22-caliber automatic rifle. While still on the phone with Ellzey, Williams shot Jeffery in the face and in the hand. When Gerald came to Jeffery's aid, Williams shot Gerald in the base of the left neck and in the upper left chest area. Jeffery ran to a neighbor's house to get help. Gerald also ran out of the home.

Clair came out of the bedroom when she heard the second gunshot. She saw Jeffery running away and Gerald in the yard. Her husband told her to get help. Clair ran to George Evans' house next door. She then ran back to her husband, who fell by the road.

Evans followed Clair, holding a shotgun. He looked to his right and saw Williams standing in the doorway of the trailer, with no more than 100 feet of open ground between them, with the rifle in his hand. Evans brought up his shotgun and aimed at Williams, warning Williams not to shoot. Williams ducked back into the trailer, and Evans ran back to his trailer. Meanwhile, Ellzey remained on the telephone. She heard two cracking, popping noises. When Williams picked the phone back up again, she started to say his name. Williams dropped the phone without saying anything.

Clair found that she could not get Gerald to stand. She went back into the trailer to find something to stop Gerald's bleeding and for her car keys. There, she found Williams, who waived the rifle at her and told her to get back and leave him alone, or else he intended to kill her. Clair replied that Gerald was hurt. She asked Williams to please help her with him. Williams then struck her in the face with the rifle, breaking her jaw. He left with the rifle and her purse, which contained her credit cards, a checkbook, and over $500 cash.

Meanwhile, Buford Billedeaua was driving a truck past the Paravicinis' trailer. He saw Jeffery and Gerald run out of the trailer. He then saw Williams follow them, holding a large black purse. When Williams took a shot at Gerald, Billedeaua stopped his truck. Williams then approached Billedeaua, telling him that he needed the truck because he had an emergency. Billedeaua noted that Williams looked as though he had been taking dope. Billedeaua got out of the truck with his keys and began to run into the woods. Williams then began shooting at Billedeaua, who avoided being shot.

Unable to flee in Billedeaua's truck without the keys, Williams turned and walked 100 yards up the road to the home of Linda and Freddie Barber. Williams was barely acquainted with the Barbers, having only played basketball with their sons, Brad and Bryan, at their church on a couple of occasions. Williams

attempted to enter the Barbers' home. Linda answered the front door. Williams inflicted gunshot wounds to her head. Williams then went into the kitchen and also shot Freddie in the head. Next, Williams shot their son, Bryan, who was asleep in his bed. It was later discovered that Bryan had multiple gunshot wounds, at least two of which were found in his head. Each victim was shot at close range.

Brad was asleep in the back bedroom. He awoke to the sound of gunshots and screaming. Brad got up and opened his door. Williams then proceeded down the hall to Brad's room. Brad closed and locked his door, but Williams kicked it in. When Brad grabbed the barrel of the gun, Williams shot him in the left hand. The two struggled, but Brad managed to escape through the backdoor, and ran through the woods to his sister's house.

Williams took the Barbers' keys and took their van. On the afternoon of February 16, he reached the Mississippi-Louisiana border and called Ellzey, who advised him to surrender. When Williams was apprehended, he told the law enforcement officers that he had thrown the rifle off an unknown bridge into the water. He had also disposed of Freddie Barber's wallet, after taking all the money it contained. Williams spent the money he stole from the Barbers and Clair Paravicini on crack cocaine after leaving the crime scene.

*B.  The Trial and Expert Testimony*

On April 12, 1992, Williams was indicted on two counts of capital murder.[2] During the trial on November 10, 1992, Williams testified that he did not remember all the events of February 14 and 15, 1992.  Williams testified that he had a few beers with Ellzey, and then drank a "pretty good bit" of beer after she dropped him off at another club.  At the club, he purchased three hits of LSD for seven dollars ($7) each from someone he did not know and remembered taking two of them.  Williams testified that he did not remember killing anyone.  He only recalls that he went into the bathroom, and that he began to feel very scared.  He said that he saw the walls move, and he saw a larger-than-life apparition walking towards him that made him fear for his life.  Regarding the day of the killings, Williams further testified that he began flipping out even before he called Ellzey, and that he tried to disguise his drug use from her to keep her from getting angry with him.  He testified that he did not remember anything that occurred between the time that he dialed her number and when he found himself driving a van in Mississippi a day later.  However, Williams did not mention seeing the apparition to the Mississippi or Alabama law enforcement officers with whom he spoke on

---

[2]  Williams was also charged with and convicted of attempted murder on the lives of Clair Paravicini and Brad Barber.

February 16.  Williams did tell the officers that he did not remember killing anyone the night before.  Williams said that he remembered seeing blood on his pants and throwing the rifle in the water near the bridge.

Dr. Claude L. Brown, a psychiatrist, met with Williams in August 1992.  At trial, Dr. Brown testified for the defense.  His testimony was based on his meetings with Williams.  He diagnosed Williams with borderline personality disorder ("BPD"), which he testified is a mental disorder characterized by inner emptiness, dissatisfaction, and impulsive actions undertaken in an effort to feel better, such as suicide attempts.  Persons with BPD have limited, but intense, fluctuating relationships.  He testified that individuals with BPD can be thrown into psychotic behavior by increases in anxiety from any source.  Dr. Brown testified that Williams' BPD dated to his childhood and was unrelated to his use of drugs before the murders.

Dr. Brown also testified that LSD is, per weight, the most psychogenic drug in the world.  He testified that LSD causes frightening distortions and detachment from reality—i.e., psychosis.  Furthermore, using alcohol and cocaine with LSD exaggerates these responses.  Dr. Brown opined that Williams was psychotic at the time of the killings.  He further opined that Williams was suffering from a mental disease or defect that rendered him unable to appreciate the nature and quality or

9

wrongfulness of his acts. He opined that this destructive psychosis resulted from a combination of his preexisting personality structure acted upon by the heavy overload of drugs that he had been taking all night. Lastly, he opined that Williams' BPD in and of itself probably did not trigger his conduct and that, had Williams been sober, the murders probably would not have occurred.

Dr. Harry McClaren, a psychologist, testified for the State. He also diagnosed Williams with BPD, as well as with anti-social personality disorder and substance abuse. Dr. McClaren testified that, given Williams' account of his drug and alcohol ingestion, he was very intoxicated at the time of the killings. He testified that psychosis resulting from LSD can last from eight to twelve hours and that Williams' amnesia was probably chemically induced. He also testified that when some individuals are highly intoxicated from hallucinogenic drugs, they may display some symptoms of psychosis.

Dr. McClaren testified to meeting Williams in August and September 1992. During those sessions, Williams recounted the events of the night before the killings. Dr. McClaren testified that Williams told him that he had a few drinks with Ellzey. After she dropped him off at the club, he bought three hits of LSD. He also ingested a long, purple tablet, and drank whiskey over the course of the evening. He also told Dr. McClaren that he went to a house on Dixon's Corner

10

where, in two trips, he bought crack.[3] He remembered arguing with Ellzey on the phone and that he then began to flip out and feel frightened. He claimed that he heard someone holler his name and felt like everyone was against him. He told Dr. McClaren that he thought the only way out was to shoot his way out. Williams claimed again that he had no other memories before he found himself driving the van in Mississippi. Dr. McClaren testified that when someone has taken LSD, he or she may see distortions of things that are there.

In contrast to Dr. Brown, Dr. McClaren opined that, because Williams deliberately shot each victim twice in or near the head, Williams was able to appreciate the wrongfulness of his acts. Dr. McClaren further opined that, because Williams had no significant psychiatric history other than attempted suicide, he knew the wrongfulness of his acts. Dr. McClaren testified that since the drugs and alcohol exacerbated Williams' BPD, without the intoxication, Williams probably would not have killed Gerald Paravicini or Linda, Freddie, and Bryan Barber.

---

[3] At trial, other witnesses testified that they thought Williams had taken drugs. Gregory Rockwell testified that he worked the door at the club. He saw Williams arrive at around 11:30 p.m. and leave around 1:00 a.m. Williams returned within an hour appearing disheveled, sweating profusely, jumping, and dancing around. Rockwell thought that Williams appeared as though he were tripping on LSD. Kelso Stewart testified that Williams asked him if he knew where some LSD or crack cocaine could be located. Stewart left the bar between 3:00 a.m. and 4:00 a.m., and when he returned, he found Williams disheveled, sweaty, and hyper.

On November 11, 1992, the jury returned a guilty verdict on one count of intentional murder during the course of a robbery for the deaths of Freddie Barber and Linda Barber pursuant to Code of Alabama § 13A-5-40(a)(2).[4]  The jury also returned a guilty verdict for the capital offense of intentional murder for the deaths of Gerald Paravicini, Freddie Barber, Linda Barber, and Bryan Barber pursuant to Code of Alabama § 13A-5-40(a)(10).[5]  The jury recommended, by a 10–2 vote, that a death sentence be imposed for the murder convictions.  On December 1, 1992, the State trial court sentenced Williams to a punishment of death.

## C.  Direct and Collateral Appeals

On August 23, 1996, the Alabama Court of Criminal Appeals affirmed Williams' convictions and death sentence.[6]  On October 3, 1997, the Supreme Court of Alabama affirmed the decision of the Alabama Court of Criminal

---

[4]  The Alabama Code states that "[m]urder by the defendant during a robbery in the first degree or an attempt thereof" is a capital offense.  Ala. Code § 13A-5-40(a)(2).

[5]  The Alabama Code states that "[m]urder wherein two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct" is a capital offense.  Ala. Code § 13A-5-40(a)(10).

[6]  *Williams v. State*, 710 So. 2d 1276 (Ala. Crim. App. 1996).

Appeals.[7]  On June 15, 1998, the U.S. Supreme Court denied Williams' petition for a writ of certiorari.[8]

In 1999, Williams filed a state habeas petition ("Rule 32 petition") in State court asserting ineffective assistance of counsel claims pursuant to Alabama Rule of Criminal Procedure 32.[9]  On August 17, 2000, the trial court held an evidentiary hearing.  On October 9, 2001, the trial court denied Williams' Rule 32 petition.  On November 14, 2003, the Alabama Court of Criminal Appeals affirmed the trial court's denial of Williams' Rule 32 petition.[10]  On May 14, 2004, the State court denied his application for a rehearing.  On October 1, 2004, the Alabama Supreme Court denied Williams' petition for a writ of certiorari.

Williams then timely filed a petition for writ of federal habeas corpus in the United States District Court for the Southern District of Alabama pursuant to 28 U.S.C. § 2254.  On April 11, 2007, the district court denied his federal habeas

---

[7]  *Ex parte Williams*, 710 So. 2d 1350 (Ala. 1997).

[8]  *Williams v. Alabama*, 524 U.S. 929, 118 S. Ct. 2325 (1998).

[9]  Rule 32.1 explicates the scope of permissible claims.  Post-conviction, a defendant may bring the following challenges:  (a) the constitution of the United States or of the State of Alabama requires a new trial, (b) the court was without jurisdiction to render judgment or to impose sentence, (c) the sentence imposed exceeds the maximum authorized by law or is otherwise not authorized by law, (d) the petitioner is being held in custody after the petitioner's sentence has expired, or (e) newly discovered material facts exist which require that the conviction or sentence be vacated by the court.

[10]  *Williams v. State*, No. CR–01–0463 (Ala. Crim. App. Nov. 14, 2003), mem. op.

13

corpus petition, and on April 28, 2008, the district court issued a COA restricting issues on appeal to determine: "(1) whether trial counsel were ineffective in presenting an invalid insanity defense; (2) whether trial counsel were ineffective in failing to present a challenge to intent based on intoxication; (3) whether the jury charges unconstitutionally shifted to him the burden of proof on intent, and whether counsel were ineffective for failing to challenge them on that basis." Doc. 49.

## II. STANDARDS OF REVIEW

Williams filed his federal habeas petition after 1996. Therefore, review of Williams' § 2254 petition falls within the scope of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").[11] Pursuant to AEDPA, we employ a "highly deferential standard for reviewing State court judgments." *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005) (citation and quotation marks omitted). Only where the State court has adjudicated the merits of Williams' ineffective assistance of counsel claims do we apply AEDPA's deferential standard of review. *Land v. Allen*, 573 F.3d 1211, 1215 (11th Cir. 2009) (per curiam).

---

[11]    Pub. L. No. 104-132, 110 Stat. 1214 (1996).

Given the confines of AEDPA, we permit relief to a petitioner held in state custody only where the State court's decision was "'(1) contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Campbell*, 416 F.3d at 1297 (quoting 28 U.S.C. § 2254(d)(1)–(2)).

"The district court's factual findings underlying the claim are reviewed for clear error, while mixed questions of law and fact are reviewed *de novo.*" *Campbell*, 416 at 1297 (citation omitted). "It is the petitioner's burden to establish his right to habeas relief[,] and he must prove all facts necessary to show a constitutional violation." *Blankenship v. Hall*, 542 F.3d 1253, 1270 (11th Cir. 2008) (citation omitted). "[A] determination of a factual issue made by a State court shall be presumed to be correct. The [petitioner has] the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Thus, [o]ur review of findings of fact by the [S]tate court is even more deferential than under a clearly erroneous standard of review." *Wood v. Allen*, 542 F.3d 1281, 1285 (11th Cir. 2008) (alteration in original) (citation and quotation marks omitted).

We review *de novo* ineffective assistance of counsel claims, which present mixed questions of law and fact. *Blankenship*, 542 F.3d at 1270. "We review *de novo* a district court's grant or denial of a habeas corpus petition." *Campbell*, 416 F.3d at 1297 (citation omitted). "We review *de novo* the district court's decision about whether the [S]tate court acted contrary to clearly established federal law, or unreasonably applied federal law, or made an unreasonable determination of fact." *Smith v. Sec'y, Dep't of Corr.*, 572 F.3d 1327, 1332 (11th Cir. 2009) (citing *Hall v. Head*, 310 F.3d 683, 690 (11th Cir. 2002)).

## III.  DISCUSSION

### A.  Strickland *Governs Claims of Ineffective Assistance*

In *Strickland v Washington*, the United States Supreme Court established the federal law governing the evaluation of all ineffective assistance of counsel claims. 466 U.S. 668, 104 S. Ct. 2052 (1984); *see* 28 U.S.C. § 2254(d)(1). "The Sixth Amendment right to counsel includes the right to *effective* assistance of counsel, since the purpose of the right to counsel more generally is to ensure a fair trial." *Blankenship*, 542 F.3d at 1272 (emphasis in original) (citing *Strickland,* 466 U.S. at 686, 104 S. Ct. at 2063–64). A petitioner's claim that the assistance rendered by his counsel is "so defective as to require reversal of a . . . death sentence has two components." *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064.

16

To establish an ineffective assistance of counsel claim under the Sixth Amendment, "[a] petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535 (2003) (citing *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064).

To establish that counsel's performance was deficient, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *Johnson v. Alabama*, 256 F.3d 1156, 1176 (11th Cir. 2001) (citation and quotation marks omitted). The U.S. Supreme Court has "emphasized that [t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins*, 539 U.S. at 521, 123 S. Ct. at 2535 (citation and quotation marks omitted).

To establish prejudice, the petitioner is required to prove "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. That is, "a petitioner must show only a reasonable probability that the outcome would have been different; he 'need not show that counsel's deficient conduct more likely than not altered the outcome in the case.'" *Brownlee v. Haley,* 306 F.3d 1043, 1059–60 (11th Cir. 2002) (quoting *Strickland,* 466 U.S. at

17

693, 104 S. Ct. at 2068). "When evaluating this probability, 'a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.'" *Brownlee*, 306 F.3d at 1060 (quoting *Strickland*, 466 U.S. at 695, 104 S. Ct. at 2069). "The petitioner bears the burden of poof on the performance prong as well as the prejudice prong of a *Strickland* claim, and both prongs must be proved to prevail." *Johnson,* 256 F.3d at 1176 (citation and quotation marks omitted). "Courts must 'indulge [the] strong presumption' that counsel's performance was reasonable and that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'" *Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000) (en banc) (alteration in original) (quoting *Strickland*, 466 U.S. at 689–90, 104 S. Ct. at 2065–66).

When assessing Williams' claim that counsel were ineffective, it is important to keep in mind that "[i]n addition to the deference to counsel's performance mandated by *Strickland*, the AEDPA adds another layer of deference—this one to a [S]tate court's decision—when we are considering whether to grant federal habeas relief from a [S]tate court's decision." *Rutherford v. Crosby*, 385 F.3d 1300, 1309 (11th Cir. 2004) (citation omitted). Thus, Williams not only has to satisfy the elements of the *Strickland* standard, but he must also show that the State "court applied *Strickland* to the facts of his case in

18

an *objectively unreasonable manner*." *Blankenship*, 542 F.3d at 1271 (emphasis in original) (quoting *Rutherford*, 385 F.3d at 1309).

In light of these principles, we will consider each of Williams' ineffective assistance of counsel challenges. Williams' ineffective assistance of counsel argument is three-fold. He complains that counsel were ineffective because counsel: (1) presented an invalid defense under Alabama law; (2) failed to properly argue a voluntary intoxication defense to negate an intent to murder; and (3) failed to object to jury instructions. Williams therefore asserts that the State court unreasonably applied *Strickland.*

## B. Counsel Did Not Ineffectively Present An Insanity Defense

### 1. Alabama Law on Insanity and Voluntary Intoxication

Alabama law provides that insanity is an affirmative defense that the defendant must prove by clear and convincing evidence. Ala. Code § 13A-3-1(a), (c). The affirmative defense of insanity requires proof that "at the time of the commission of the acts constituting the offense, the defendant, as a result of severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts." Ala. Code § 13A-3-1(a). Thus, in order to establish the affirmative defense of insanity, the defendant must establish that he suffered from a mental disease.

19

On the other hand, voluntary intoxication is not an affirmative defense to capital murder in Alabama. Evidence that a defendant was voluntarily intoxicated is, however, admissible "whenever it is relevant to negate an element of the offense charged," such as intent to murder. Ala. Code § 13A-3-2(a). Importantly, it must be emphasized that "[i]ntoxication *in itself* does not constitute mental disease or defect within the meaning of Section 13-3A-1." Ala. Code § 13A-3-2(d) (emphasis added). Pursuant to Alabama law, "[t]he degree of intoxication required to establish that a defendant was incapable of forming an intent to kill is a degree *so extreme* as to render it impossible for the defendant to form the intent to kill." *Flowers v. State*, 922 So. 2d 938, 955 (Ala. Crim. App. 2005) (emphasis added) (citation and quotation marks omitted). In short, the level of intoxication needed to negate intent must rise "to the level of statutory insanity." *Ware v. State*, 584 So. 2d 939, 946 (Ala. Crim. App. 1991) (citation and quotation marks omitted).

## 2. Deficient Performance

Williams argues that his counsel performed deficiently because there was no legal or factual basis for his attorney to assert an insanity defense based on a mental disease. Williams asserts that the facts of his case only supported a voluntary intoxication defense for purposes of negating intent, and that his counsel

20

should not have conflated the requirements of asserting a voluntary intoxication defense with an insanity defense. Williams argues that the record is devoid of any expert testimony from a psychiatrist that would support a plausible claim of insanity under Alabama law. He therefore contends that his counsel's performance was deficient and unreasonable by professional standards because an insanity defense based on intoxication was precluded by Alabama law. We find no merit to this argument.

To overcome the strong presumption "in favor of competence, Williams must bear the heavy burden "that no competent counsel would have taken the action that his counsel did take." *Haliburton v. Sec'y, Dep't of Corr*., 342 F.3d 1233, 1243 (11th Cir. 2003) (citation and quotation marks omitted). We have said before that "[c]ounsel must be permitted to weed out some arguments to stress others and advocate effectively." *Gaskin v. Sec'y, Dep't of Corr.*, 494 F.3d 997, 1003 (11th Cir. 2007) (per curiam) (citation and quotation marks omitted). Although Williams argues that counsel only mentioned the defense of voluntary intoxication once, "abandoning one defense in favor of another that counsel reasonably perceives to be more meritorious is not deficient performance." *Housel v. Head*, 238 F.3d 1289, 1295 (11th Cir. 2001) (citation omitted). Review of the record shows that the defense of insanity based on a mental disease was a

sound strategy employed by Williams' counsel, which we are not inclined to second-guess. *See Strickland*, 466 U.S. at 689, 104, S. Ct. at 2065. The record illustrates several reasons why a reasonable defense counsel would pursue an insanity defense based on a mental disease, exclusive of voluntary intoxication.

First, contrary to Williams' suggestion, the record indicates that there was some legal and factual basis for counsel to pursue the insanity defense. Two expert witnesses testified that Williams suffered from a "mental disease." Vol. II, P–1 at R-363–64, 516. At trial, Dr. Brown, a psychiatrist, presented evidence regarding Williams' mental state. Dr. Brown opined that Williams was "crazy at the time" of the killings, "crazy from a combination of his preexisting personality structure acted upon by the heavy overload of drugs" that Williams had been taking all night long. Vol. II, P–1 at R-363. Dr. Brown also testified that on the morning of February 15, Williams suffered a "mental disease or defect" called BPD. Vol. II, P–1 at R-363–364. Although Dr. Brown explained that the petitioner's intoxication did exacerbate his BPD, simply discussing intoxication does not undermine the fact that counsel appropriately presented evidence that Williams suffered from a mental disease.

Dr. McClaren, a psychologist who met with Williams on three different occasions, also testified about Williams' mental state. Dr. McClaren testified that

22

in September 1992, Williams had two previous suicide attempts.[12] After consultation with Williams, Dr. McClaren opined that Williams suffered from a "mental disease or defect" called BPD and an anti-social disorder coupled with several substance abuse diagnoses. Vol. II, P–1 at R-516. Because both expert witnesses diagnosed Williams with a mental disease or defect, it was not unreasonable for counsel to offer a defense based on insanity.

Second, the record contains contradictory testimony from witnesses commenting on whether they believed Williams appeared to be inebriated or high on drugs during the killings. On May 18, 1992, Sandra Ellzey testified to a grand jury in Mobile County that when she spoke to Williams on the phone just before the killings, Williams sounded normal, his speech was not slurred, and he was soft-spoken and calm. Ellzey testified that she had been with Williams long enough to know when he was high or when he had been drinking. According to her, Williams sounded as if he was sober. At trial, Ellzey testified that Williams was "very calm and he was quiet[, and] [h]e just appeared to be normal" as they spoke on the telephone the during the killings. Vol. II, P–1 at R-466. Ellzey's

---

[12]    In May 1990, Williams shot himself in the chest. In February 1991, he attempted suicide by intentionally overdosing on cocaine.

testimony to the grand jury and at the trial undermines the argument that Williams was intoxicated to the degree of insanity.

Additionally, Clair testified that on the morning Williams killed her husband Gerald, Williams did not appear to be under the influence of any drugs, and that "he acted normal." Vol. II, P–1 at R-244–45. This evidence suggests that on the morning of the shootings, Williams may not have been so intoxicated that it was "impossible" for him to form an intent to kill. Thus, counsel's decision to offer the insanity defense independent of intoxication was not only sound, but this strategy was to Williams' benefit. Therefore, it was reasonable for defense counsel to pursue a legal theory of insanity based on a mental disease, independent of intoxication.

Third, counsel's strategy was sound because Williams did not consistently report facts suggesting that his intoxication was so excessive that it amounted to insanity. For example, Williams recalls that on the morning after the shootings, his clothes were covered in blood. After Williams was taken into custody by law enforcement, he did not mention that he was scared, or that he thought he was shooting at an apparition he believed chased him. Vol. II, P–1 at R-502. In his statement to the police, Williams simply says that he did not remember shooting anyone. The first time Williams mentioned that he thought an apparition was

24

coming after him, and that the only option was to shoot his way out, was after he was evaluated by Dr. McClaren in August and September 1992. Vol. II, P–1 at R-511. A jury may have considered these inconsistencies as damaging to Williams' intoxication defense. Furthermore, Williams testified that he was hallucinating while he spoke with Ellzey on the phone. He further testified that the walls were moving. Vol. II, P–1 at R-493. However, on the night of the murders, Williams did not mention any of these hallucinations to her as he shot Jeffery and killed Gerald.

In light of this evidence, we cannot say that "no competent counsel would have taken the action that his counsel did take." *See Haliburton*, 342 F.3d at 1243 (citation and quotation marks omitted). Williams has not proffered any evidence to show otherwise. We agree with the district court that because the jury must consider intent as an element of capital murder, the jury is free to accept or reject the truthfulness of Williams' assertion that he was so intoxicated that he did not have intent to murder. *See Justo v. State*, 568 So. 2d 312, 314 (Ala. Crim. App. 1990) (citation and quotation marks omitted) (explaining that when the defense of voluntary intoxication is raised, the jury can reject the truthfulness of the defendant's assertion that he took drugs). Counsel's presentation of an insanity defense based on a mental disease did not detract or weaken the inference that

25

Williams was on drugs. As explained in *Strickland*, counsel's performance is entitled to a high level of deference. 466 U.S. at 689, 104 S. Ct. at 2065. Williams has not offered evidence which would appropriately overcome the strong presumption that counsel's assistance was competent.

Williams' trial attorney's presentation of an insanity defense as a mental disease or defect pursuant to Alabama law was not unreasonable. We agree with the State court, which decided that counsel's election to present the insanity defense was a sound strategic decision, and that counsel were not ineffective. *Williams v. State of Alabama*, No. CR–01–0463 (Ala. Crim. App. Nov. 14, 2003), mem. op. at 17. Williams has failed to satisfy the first prong of the *Strickland* test, that counsel's performance in asserting the affirmative defense of insanity fell below an objective standard of reasonableness.

## 3. Prejudice

Even if counsel were deficient, Williams is unable to satisfy the prejudice prong of *Strickland*. After the reviewing counsel's insanity strategy, Williams has not established that, but for counsel's professional errors the outcome of the proceedings would have been different. The record contains testimony from witnesses who called into question the degree of intoxication Williams experienced. Given the contradictory accounts regarding the degree of Williams'

26

intoxication, it is unlikely that these inconsistencies would have changed the outcome of the proceedings.  Accordingly, we find that the State court's determination was a reasonable application of *Strickland.*

### C. The Voluntary Intoxication Defense was Not Improperly Argued

Williams argues that counsel were deficient in presenting a proper voluntary intoxication defense during the guilt/innocence phase.  In support of this contention, Williams argues that counsel did not thoroughly investigate and present an additional expert witness such as a psychopharmacologist.  Williams explains that a psychopharmacologist would have testified about the effects LSD, alcohol, and cocaine have on the brain.  He speculates that this additional testimony would have negated the intent required for a capital murder offense.  He therefore argues that, but for the deficiency of defense counsel, he would not have been eligible for the death penalty.  We find no merit to this argument.

Counsel has a constitutional, independent duty to investigate and prepare a defense strategy prior to trial.  *House v. Balkcom*, 725 F.2d 608, 618 (11th Cir. 1984); *see also  Fugate v. Head*, 261 F.3d 1206, 1221 (11th Cir. 2001).  However, this duty does not necessarily require counsel to investigate each and every evidentiary lead.  *Harris v. Dugger*, 874 F.2d 756, 763 (11th Cir. 1989).  Yet, the decision to restrict or limit an investigation "must flow from an informed

27

judgment." *Id.* "'[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Wiggins,* 539 U.S. at 521, 123 S. Ct. at 2535 (alteration in original) (quoting *Strickland,* 466 U.S. at 690–91, 104 S. Ct. at 2066). That is, counsel has a duty to make a "reasonable decision that makes particular investigations unnecessary." *Id.* "'In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" *Id.* at 521–22, 123 S. Ct. at 2535 (quoting *Strickland,* 466 U.S. at 690–91, 104 S. Ct. at 2066).

Therefore, "[i]n assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527, 123 S. Ct. at 2538. As we explained in *Chandler*, "[i]nvestigation (even a nonexhaustive, preliminary investigation) is not required for counsel reasonably to decline to investigate a line of defense thoroughly." 218 F.3d at 1318 (citing *Strickland,* 466 F.3d at 690, 104 S. Ct. at 2066).

In *Grayson v. Thompson*, the petitioner advanced an argument substantially similar to the one Williams makes in this case. 257 F.3d 1194, 1218–19 (11th Cir.

28

2001). Grayson argued that his trial lawyer was ineffective for failing to develop and present additional evidence regarding his chronic alcoholism and intoxication at the time of the offense to negate the intent required for a capital murder offense. In response to this argument, we advised that "[a]lthough [P]etitioner's claim is that his trial counsel should have done something more, we first look at what the lawyer did in fact." *Id.* (alteration in original) (quoting *Chandler*, 218 F.3d at 1320). "'Our court's proper inquiry is limited to whether th[e] course of action [followed by defense counsel] might have been a reasonable one.'" *Id.* (alteration in original) (quoting *Chandler*, 218 F.3d at 1319).

*1. Deficient Performance*

We must first examine what counsel did in fact. At trial, defense counsel's theory was, in part, that Williams lacked the specific intent to be guilty of capital murder. At trial, neither the defense nor the State offered a motive for Williams' violent crimes, other than a drug-induced psychosis. The record shows counsel presented evidence that Williams was intoxicated and had consumed large amounts of drugs. Counsel put Williams on the stand to testify about the large amounts of drugs and alcohol he consumed the night before, and the morning of, the killings. Counsel emphasized Williams' repeated purchase of LSD or ecstasy, prescription drugs, and alcohol. Vol. II, P–1 at R-299–301. Counsel also read

aloud in court John Funderburg's statement to the police that reported that when he was with Williams the night before and into the morning of the killings, Williams bought and consumed LSD, or dope. Vol. II, P–1 at R-313. Consistent with his intoxication claims, Williams continually testified that he could not remember the specifics of the crimes other than consuming drugs. Additionally, on direct examination, Dr. Brown testified that the combination of drugs and BPD rendered Williams so intoxicated and psychotic that he was unable to appreciate the wrongfulness of his acts. This testimony speaks to the state of mind Williams had on the morning of the killings. Based on these examples, it is clear that counsel adequately emphasized that Williams engaged in excessive alcohol and drug consumption prior to the crimes, and Williams has not demonstrated that counsel needed to argue further. Presentation of this evidence supports Williams' contention that he did not possess the requisite intent to kill. Accordingly, counsel's presentation did not fall below the objective reasonableness standard of professional performance.

Despite these efforts, Williams argues that if his counsel had enlisted testimony from a psychopharmacologist, such testimony would have bolstered his voluntary intoxication defense and provided a clearer demonstration of his argument to the jury. Williams made a similar argument during his Rule 32 post-

conviction evidentiary hearing, but the State court found it unpersuasive. *Williams v. Alabama*, CR-01-0463 (Ala. Crim. App. Nov. 14, 2003), mem. op. at 19. Counsel placed Dr. Brown on the stand to testify to the *effects* that the combination of LSD, crack, and alcohol would have had on Williams' *behavior*, which is relevant information for the defense. Williams only assumes that a psychopharmacologist could fill in additional testimony where Dr. Brown's was allegedly insufficient. Thus, Williams has not demonstrated what kind and how much investigation a reasonable lawyer would have made under the circumstances in this case. *See Horsley v. Alabama*, 45 F.3d 1486, 1495 (11th Cir. 1995) (citation and quotation marks omitted).

Moreover, Williams did not call his trial counsel to testify at the Rule 32 post-conviction evidentiary hearing. Thus, we have no evidence as to whether trial counsel investigated additional experts, or why trial counsel chose not to offer additional experts. "An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption of counsel's competency. Therefore, where the record is incomplete or unclear about [counsel]'s actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment." *Chandler*, 218 F.3d at 1314 n.15 (alteration in original) (citation and quotation marks omitted). Because Williams has offered no evidence to support a

31

conclusion that trial counsel failed to conduct an investigation into additional experts, we presume Williams' trial counsel exercised reasonable, professional judgment.

*2. Prejudice*

Alternatively, even if Williams had demonstrated counsel's performance was deficient, the performance was not prejudicial. In an attempt to establish prejudice, Williams reiterates that a sufficient voluntary intoxication defense would have negated the element of intent which, in turn, would have taken the death penalty off of the table. We are not persuaded by this argument.

Pursuant to *Strickland*, to establish prejudice, the defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *Lynd v. Terry*, 470 F.3d 1308, 1315–16 (11th Cir. 2006). That is, but for counsel's errors, it is reasonably probable that testimony from a psychopharmacologist would have affected the sentence eventually imposed. Under this standard, Williams has not shown a reasonable probability that presenting a stronger voluntary intoxication defense would have resulted in a life sentence rather than the death penalty.

Dr. McClaren testified that Williams' actions during the killings would not negate an intent to commit capital murder. In this respect, Dr. McClaren offered the most compelling opinion refuting Williams' speculation that voluntary intoxication was the strongest theory. Given his testimony, the jury may have recommended the death penalty regardless of whether a psychopharmacologist had testified. For example, Dr. McClaren testified that, because the victims sustained, not one, but multiple gunshot wounds to the head, throat or upper chest area, Williams' actions were purposeful. Vol II, Tab P–1 at R-519–20. Dr. McClaren further opined that the crimes were

> an ongoing series of events starting at one home and taking with him from one home a purse or money, attempting to commandeer a car; not being successful in that, continuing on to another home which [he] invaded. Again, the victims at that home were killed in the manner I described [as] being shot in the head twice. Then [for Williams] to take the keys, to be able to get into a car, to drive away, to flee the scene. These things suggest to me that *despite being intoxicated* that Jason Williams knew what he was doing at the time.

Vol II, Tab P–1 at R-520 (emphasis added).

Given Dr. McClaren's testimony regarding Williams' actions, and the manner in which the killings transpired, we cannot say that he has "met the burden of showing that the decision reached [by the jury] would reasonably likely have been different absent the errors." *Strickland*, 466 U.S. at 696, 104 S. Ct. at 2069.

33

Furthermore, the record is replete with evidence that the jury could have found that Williams' actions were deliberate and purposeful, rather than finding in favor of his voluntary intoxication defense. It is also unlikely that testimony from a psychopharmacologist would have changed the outcome of this case. To this extent, we find that the State court made a reasonable application of federal law, and the district court committed no error in its decision.

## D. The Jury Instructions

Lastly, Williams contends that counsel rendered deficient performance for failure to object to the jury instructions. He also argues that the jury instructions on insanity and voluntary intoxication were confusing and contradictory. Appellant Br. 57. We decline to entertain the merits of the latter argument, as our review is restricted to the issues specified in the certificate of appealability. *McClain v. Hall*, 552 F.3d 1245, 1254 (11th Cir. 2008) (citing *Murray v. United States*, 145 F.3d 1249, 1250–51 (11th Cir. 1998) (per curiam)); *Newland v. Hall*, 527 F.3d 1162, 1166 n.4 (11th Cir. 2008); *see* 28 U.S.C. § 2253(c)(3) (explaining that the COA must specifically indicate the issues for review). The district court's order granting the COA was limited to the specific issue of "whether the jury instructions unconstitutionally shifted to him the burden of proof on intent." Doc. 49 at 1. We therefore find that, to the extent that Williams argues counsel were

34

ineffective for failure to object to confusing or contradictory jury instructions, he has not raised a cognizable claim within the scope of the limited review specified in the COA.[13]

Williams contends that counsel were ineffective for failure to object to the following jury instructions that he claims, when read together as a whole, unconstitutionally shifted the burden of proving intent during the guilt phase: (1) that every person over the age of fourteen is presumed to have sufficient mental capacity to appreciate certain kinds of conduct are criminal acts; (2) that Williams had the burden of proving insanity by clear and convincing evidence; and (3) that voluntary intoxication cannot negate intent unless it amounts to insanity. Appellant Br. 56–57, 60.

*1. AEDPA Deference for State Habeas Court*

As an initial matter, a question presented is whether the district court erred when it afforded no AEDPA deference to the State court's adjudication of

---

[13] We also decline to consider the merits of this claim because it is not certain that Williams clearly presented this argument to the district court as a specific, enumerated claim of ineffective assistance of counsel. *See Jones v. Campbell,* 436 F.3d 1285, 1304 (11th Cir. 2006). The argument that the jury instructions were confusing was mentioned within the statement of the case, but it was not argued or mentioned again in the amended habeas petition. Doc. 11 at 18, 65–66. Additionally, the district court's order on the petition made no ruling on this issue. "As a general rule, we will not address issues or arguments on appeal that were not fairly presented to the district court." *Jones,* 436 F.3d at 1304. (citing *Depree v. Thomas*, 946 F.2d 784, 793 (11th Cir. 1991)).

Williams' ineffective assistance of counsel claim on the issue of whether the jury instructions shifted the burden to prove intent. To reiterate, AEDPA affords a high level of deference when the State court adjudicates a constitutional claim on the merits. *See* 28 U.S.C. § 2254(d)(1). Therefore, if the State court adjudicated the merits of Williams' claim that the jury instructions unconstitutionally shifted the burden to prove intent, the State court is entitled to deference where principles of federal law are not violated. However, the district court reviewed this claim *de novo*.

After review, we find that the district erroneously reviewed Williams' burden-shifting portion of his claim under a *de novo* standard. Doc. 21 at 34–35. The district court presented a concise reason for applying the *de novo* standard, explaining that the "State court was unaware that a constitutional, burden-shifting claim had also been asserted." *See id.* at 34. However, we are reluctant to agree.

The record indicates that the State court was aware of Williams' challenge to the jury instructions, which he alleged shifted the burden of proving intent to him. In his Rule 32 petition as amended, Williams raised the claim that counsel were ineffective for failing to object to jury instructions that shifted the burden to prove that he had the requisite mental state of intent to kill. Vol. VIII, Tab P–13, at 17–19. In support of his Rule 32 amended petition, Williams also filed a post-

hearing brief with the State court. Vol. XI, Tab P–36 at R–346. As the district court notes, Williams argued that a jury charge invoking the presumption of intent may unconstitutionally shift the burden of proof to the defendant. Vol. XI, Tab P–36 at R–368. Williams' argument, however, conflates the requirements of asserting the affirmative defense of insanity, the defense of voluntary intoxication, the presumption of sanity, and the burden the State must carry in order to prove intent to commit capital murder, into one burden, which he says shifted to him in an unconstitutional manner. Vol. XI, Tab P–36 at R–346. Albeit confusing, this argument was before the State court. Because both the Rule 32 petition and the post-conviction hearing brief present this argument, we are unable to agree with the district court that the State was unaware of the burden-shifting argument.

The question now becomes whether the State court's decision on Williams' Rule 32 petition regarding the burden to prove intent constituted an adjudication on the merits. After reviewing the State court's order of the Rule 32 petition, the record indicates that the State court did in fact adjudicate on the merits Williams' burden-shifting claim.

"A decision that does not rest on procedural grounds alone is an adjudication on the merits, regardless of the form in which it is expressed." *Blankenship*, 542 F.3d at 1271 n.4 (citation and quotation marks omitted).

Furthermore, § 2254(d)(1) requires only an adjudication on the merits in State court proceedings. *Wright v. Sec'y, Dep't of Corr.*, 278 F.3d 1245, 1254 (11th Cir. 2002). "The chief responsibility of judges is to decide the case before them. They may, or may not, attempt to explain the decision in an opinion." *Id.* at 1255. That is, "[t]he statutory language focuses on the result, not on the reasoning that led to the result." *Id.* Thus, a State court is not required to list an entire rationale as to why it rejects the merits of a claim properly before it. *See id.*

After review of the record, we find that the State court adjudicated the merits of Williams' claim that counsel were ineffective for failure to object to certain jury instructions that shifted the burden to prove intent. In its October 2, 2009 order, the State court made the following statement regarding the Rule 32 petition:

> The Court has reviewed the evidence contained in the record of the original proceedings, the evidence presented at the Rule 32 evidentiary hearing, the pleadings and arguments of counsel for the State and Petitioner, and has reviewed the relevant law. This Court finds that Williams' trial counsel did not provide ineffective assistance during Williams' guilt phase trial.

Vol. VIII, Tab P–17 at 22. This statement constitutes an adjudication on the merits. Having already met the requirements of adjudication under § 2254(d)(1), the State court engaged in analysis and explained that the defendant had the

38

consistent "burden of proving insanity." Vol. VIII, Tab P–17 at 28. The State

court also clarified Williams' misreading of the law, and explained that voluntary

intoxication is a defense that the defendant also had the burden to "prove during a

trial." Vol. VIII, Tab P–17 at 28. The State court reasoned that jury instructions

that note correct statements of law are not erroneous. Vol. VIII, Tab P–17 at 28.

The State court then concluded that "trial counsel were not ineffective for failing

to object to such instructions." Vol. VIII, P–17 at 28. Indeed, we read these

statements to mean that the State court adjudicated the merit of Williams'

challenge to the jury instructions; it properly determined that the charge did not

inappropriately shift the burdens between the parties.[14]

---

[14] The State court explained its determination by clarifying the differences between the burden placed on the defendant when asserting affirmative defenses, and the State's burden to prove the requisite mental state of intent. In the jury instructions section, the State court made the following clarifications:

> The [c]ourt *concludes* that insanity is an affirmative defense that must be pleaded and proved by the defendant to the reasonable satisfaction of the jury, and that the burden of proving insanity remains on the defendant throughout a trial. Ala. Code. § 13A-3-1(c); *Dunaway v. State*, 746 So. 2d 1021, 1030 (Ala. Crim. App. 1998). Intoxication, likewise, is an affirmative defense that the defendant must prove during a trial. *Roy,* 680 So. 2d at 941. Jury instructions that note the above correct statements of law are not erroneous and Williams' trial counsel were not ineffective for failing to object to such instructions.

Vol. VIII, P–17 at 27–28 (emphasis added).

Accordingly, the district court erroneously applied a *de novo* review, and should have afforded AEDPA deference to the State court's adjudication of Williams' ineffective assistance of counsel claim with regard to the jury instructions. However, this error is harmless because the district court correctly applied the principles of *Strickland*, and it found that the counsel's performance was not ineffective. *See Blankenship,* 542 F.3d at 1272 (affirming the district court's denial of a federal habeas petition after the district court "erroneously afforded no AEDPA deference to the state court's adjudication of Blankenship's ineffective assistance of counsel claim"). With the proper principles of deference in place, we next determine whether the State court's application of federal law is contrary to or an unreasonable application of federal law.

*2. Deficient Performance*

*a. The Instructions on Intent to Commit Capital Murder Did Not Shift the Burden of Proving Intent*

On the issue of whether the jury instructions relieved the prosecution's burden of proving intent to commit capital murder, we find that the jury instructions did not shift this evidentiary requirement to Williams. Therefore, the performance was not deficient for counsel's failure to object. Contrary to Williams' assertion, the record shows that the trial court explicitly charged the jury

40

with the following instructions about the State's responsibility, or burden, to prove intent:

> In order to prove the elements of the capital offense the State must prove the intentional murder by the defendant of Linda Barber and Freddie Barber . . . . [I]t must be proved that during the course of that robbery the defendant intentionally murdered Freddie Barber and Linda Barber. . . . So it is required that the State prove that the defendant shot Linda Barber and Freddie Barber with a gun, that in so doing he killed them, and that in so doing he acted with the intent to cause their death. . . . [T]he State [has] the burden of proving all of the elements of these offenses beyond a reasonable doubt

Vol. II, Tab P–1 at R-588–90.

With regard to the deaths of Gerald and Bryan, the trial court charged the prosecution with the burden to prove that Williams intended to cause their deaths. Vol. II, Tab P–1 at R-593–94. We agree with the district court that Williams' contention that the State did not have to prove the requisite mental state is meritless. The jury instructions explicitly assigned the burden of proving intent as an element of the crime for capital murder to the State. We find no error with this charge, and the State committed no unreasonable application of federal law when it concluded that counsel were not ineffective for failure to object to these instructions.

b. *The Instructions on the Presumption and Insanity*

41

Williams also takes issue with the following instructions on the presumption:

> By law every person over the age of fourteen is presumed to be responsible for his or her acts. That is to say that every person over that age is presumed to have sufficient mental capacity to appreciate that certain types of conduct are criminal or are acts which are against the law. Thus this presumption is a fact in the case which must be considered by the jury along with other evidence. In applying these propositions you must consider all the evidence in determining the question of insanity at the time of the commission of the alleged crimes. In making your determination you may reject any or all expert testimony even though it is without conflict.

Vol. III, Tab P–1 at R-603–04. The relevant instructions on insanity are follows:

> It is an affirmative defense to a prosecution for any crime that at the time of the commission of the acts constituting the offense the defendant as a result of severe mental disease or defect was unable to appreciate the nature and quality or wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense. Severe mental disease or defect does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct. The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

Vol. III, Tab P–1 at R-602–03.

Williams argues that these instructions suggested to the jury that because he is over the age of fourteen, it should presumed that he intended to commit capital

42

murder. Williams further argues that because the jury instructions also required him to show by clear and convincing evidence that he is insane, the defense of insanity acts as a rebuttal to the presumption of intent. He therefore, argues that the presumption unconstitutionally shifted the burden to prove intent to him. After review of these instructions, we find this argument unpersuasive.

Williams cites to *Sandstrom v. Montana* as an example of a proscribed presumption. *See* 442 U.S. 510, 521, 99 S. Ct. 2450, 2458. In *Sandstrom*, the Supreme Court held that a defendant's state of mind or intent that is an element of a crime "cannot be taken from the trier of fact through reliance on a legal presumption of wrongful intent." 442 U.S. at 522, 99 S. Ct. at 2458 (citing *United States v. United States Gypsum Co.*, 438 U.S. 422, 98 S. Ct. (1978)) (emphasis omitted). A jury instruction which creates a burden-shifting presumption or a "conclusive presumption" is unconstitutional. *Id.* at 523–24, 99 S. Ct. at 2459 (citation omitted). Further, an instruction must not relieve the government of its burden of proving each and every element of the crime. *Id.* at 523 (citation omitted); *accord Parker v. Sec'y, Dep't of Corr.*, 331 F.3d 764, 776 (11th Cir. 2003) ("[I]t is a commonplace of criminal law that a conviction violates due process if the jury did not have to find the elements necessary for a guilty verdict beyond a reasonable doubt."); *In re Winship*, 397 U.S. 358, 364, 90 S. Ct 1068,

43

1073 (1970) (holding that due process requires "proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"). After reviewing the challenged presumption, we find that the principles set forth in *Sandstrom* were not violated for two reasons.

First, in *Sandstrom*, the Supreme Court rejected "conclusive presumptions" that relieved the State of its burden to prove intent. 442 U.S. at 523–24, 99 S. Ct. at 2459 (citation omitted). In this case, however, Williams' argument is misplaced. We agree with the district court that the challenged presumption invokes a presumption of sanity, and not a presumption of intent as Williams suggests. The ultimate decision on the issue of intent was left to the trier of fact alone, and the trial court's simple mention of the presumption of sanity (not intent) did not invade the jury's fact-finding function. *See Sandstrom* 442 U.S. at 523, 99 S. Ct. at 2459. Indeed, the instruction that a person is presumed to possess sufficient mental capacity to appreciate that his conduct is wrongful  is a presumption of sanity. *See* Vol. III, Tab P–1 at R-603–04. Alabama law has long recognized the presumption of sanity, and we agree with the district court that Williams has failed to show that the presumption of sanity is unconstitutional.[15]

---

[15] The U.S. Supreme Court said that a State may "place the burden of persuasion on a defendant to prove insanity as the applicable law defines it, whether by a preponderance of the evidence or to some more convincing degree." *Clark v. Arizona*, 548 U.S. 735, 739, 126 S. Ct.

Second, we reject Williams' contention that the presumption of sanity shifts the burden to prove intent to him. He argues that when read together, asserting an affirmative defense of insanity acts as a rebuttal to the presumption of sanity because he has to prove that he is insane by clear and convincing evidence. Williams asserts that if we examine the jury instructions in this manner, the charge violates principles of *Sandstrom*. Williams' argument is not only extraneous, but also it is a misunderstanding of Alabama law, and we find it groundless.

In *Archie v. State*, Alabama summarized its principles on the issue of sanity as the following:

> 1. [b]y statute, there is a presumption of sanity extending to all persons over the age of 14.
>
> 2. The defense of insanity is an affirmative defense. The burden of proving this defense rests upon the defendant and never shifts to the State.
>
> 3. The burden upon the defendant is to establish the issue of legal insanity by [clear and convincing evidence] and to the reasonable satisfaction of the jury.

---

2709, 2714 (2006). Each state has the "authority to define its presumption of sanity (or capacity or responsibility) by choosing an insanity definition . . . and placing the burden of persuasion on defendants claiming incapacity as an excuse" from customary criminal responsibility. *See id.* at 771, 126 S. Ct. at 2732. In *Clark*, the U.S. Supreme Court substantially left insanity rules open to the states. *Id.*

875 So. 2d 336, 341 (Ala. Crim. App. 2003) (alterations in original) (citation and quotation marks omitted).[16] After review of the jury instructions and in light of Alabama law, we find that the presumption of sanity does not shift the burden of proving intent to Williams, nor do we find that asserting the affirmative defense of insanity acts as a rebuttal to the presumption of sanity. Rather, Alabama law allows the defendant to prove, by clear and convincing evidence, that he was incapable of forming the requisite intent to commit capital murder. This is an opportunity for the defendant to explain why and how a mental disease could render him unable to appreciate the nature and quality or wrongfulness of his acts even though his actions may appear to be deliberate and purposeful. *See* Ala. Code § 13A-3-1(a). Indeed, the burden to prove this by clear and convincing evidence is on the defendant. However, when asserting the affirmative defense, the burden remains on the State to prove beyond a reasonable doubt that Williams intended to commit capital murder. The two burdens are not mutually exclusive, and both parties have to carry their burden irrespective of the other. Because we find that neither the presumption of sanity nor the affirmative defense of insanity shifted the burden to prove intent, counsel were not ineffective for failure to object

---

[16] *See also Knight v. State*, 907 So. 2d 470, 479–80 (Ala. Crim. App. 2004) (explaining that Ala. Code § 13A-3-1 provides that insanity is an "affirmative defense which the defendant must prove by clear and convincing evidence").

46

to these instructions. Accordingly, the State court did not apply *Strickland* in a manner that was contrary to, or an unreasonable application of federal law.

*c. The Instructions on Voluntary Intoxication*

Williams argues that counsel were ineffective for failure to object to the instruction that voluntary intoxication cannot negate intent unless it amounts to insanity. Appellant Br. 56–57. Williams argues that because the defense of voluntary intoxication requires such a high degree of intoxication, the jury instructions ultimately required that he prove that he is insane in order to negate intent. Therefore, Williams argues that because asserting the defense of voluntary intoxication requires a showing that he is insane, the defense acts as a mechanism that requires him to rebut the presumption of sanity. He argues that this amounts to an unconstitutional burden-shift. After careful review of the jury instructions on voluntary intoxication and insanity, we find no merit to Williams' contention. Therefore, counsel were not deficient for failing to object.

Concerning counsel's argument on voluntary intoxication, the trial judge stated:

> This contention is separate from the defendant's plea that he is not guilty by reason of a mental disease or defect. In the— the situation concerning voluntary intoxication deals with the contention that the defendant could not form an intent to commit murder or an intent to engage in a course of conduct on

account of his alleged voluntary intoxication. This *differs* from the defense of not guilty by reason of mental disease or defect . . . . To expand on that somewhat, I charge you that insanity is a complete defense to a crime. Voluntary intoxication is not a defense, but may in extreme cases negate the requisite intent to commit a specific crime and therefore reduce the grade of the offense.

Vol. II, Tab P–1 at R-595–96 (emphasis added). The trial court went on to explain that "[t]he degree of intoxication necessary to negate specific intent[,] and thus reduce the charge must amount to insanity." Vol. II, Tab P–1 at R–597. The trial court further emphasized that "intoxication must be so excessive as to paralyze the mental facilities and render the accused incapable of forming or entertaining the required intent." Vol. II, Tab P–1 at R–599.

We agree with the State court that the jury instructions were not improper because they are a correct statement of Alabama law. Although Williams asks us to read all of the burdens together in an amalgamated manner, the jury instructions do not translate to a shift of the burden to prove intent. As mentioned before, the burden to prove intent for capital murder rests with the State and does not change throughout the course of the trial. As the State court rightly concluded, insanity is an affirmative defense that must be proven by the defendant. Vol. VIII, Tab P–1, at 27–28; *see* Ala. Code § 13A-3-1(c). Indeed, asserting a defense such as voluntary intoxication is an opportunity for the defendant to counter the

48

prosecution's case that he intended to commit the crime of murder. The defense of voluntary intoxication is therefore, available to the defendant to negate intent and does not act as a rebuttal to the presumption of sanity. The defense creates a favorable circumstance for the defendant to explain to the judge and jury that his voluntary intoxication, whether through drugs or alcohol, became so great that it rendered him mentally incapable to form an intent to commit murder. Thus, like the affirmative defense of insanity, voluntary intoxication does not shift the burden to prove intent from the State to the defendant, as Williams' conflated argument suggests. The State court therefore, correctly found that counsel were not ineffective. Affording deference to the State on this issue, we find no contrary or unreasonable application of federal law.

## IV. CONCLUSION

The district court did not err by denying Williams' federal habeas corpus relief as to his claim that his counsel rendered ineffective assistance. For the reasons stated above, Williams has not proved that counsel performed in an objectively unreasonable manner based on professional standards, and that he suffered prejudice. Williams has also failed to show the State court's decision is contrary to, or resulted in an unreasonable application of, clearly established

federal law in *Strickland*. We therefore, affirm the district court's denial of his habeas petition.

**AFFIRMED**.